## COOLEY v. O'CONNOR.

1. A certificate signed by only two of the direct tax commissioners appointed under the act of Congress of June 7th, 1862, that land charged with the tax, had been sold to the United States, is admissible in evidence in an action brought to try title to the land.

2. It is error to rule such a certificate void.

3. In trespass to real property brought to try the title, a freehold or a mere possessory right in the defendant may be given in evidence under the general issue.

4. The act of Congress contemplates a certificate of sale, though the United States becomes the purchaser.

5. Whether the advertisement of sale was such as the law required is a mixed question of law and fact, and it must be submitted to the jury.

ERROR to the Circuit Court for the District of South Carolina; in which court Mrs. O'Connor brought suit against Cooley and others, for trespass on a lot of ground which she alleged to be hers, and to try title to the same. The case was thus:

On the 5th August, 1861, Congress passed an act to provide increased revenue from imports to pay the interest on the public debt, &c., apportioning the taxes authorized among the several States.

South Carolina being in insurrection at the time, and not paying her quota under the act, Congress on the 7th of June, 1862, passed another act, which provided by its first section that:

"When in any State, or in any portion of any State, by reason of insurrection or rebellion, the civil authority of the government of the United States is obstructed, so that the provisions of the act of August 5th, 1861, for assessing, levying, and collecting the direct taxes therein mentioned cannot be peaceably executed, the said direct taxes, by said act apportioned among

the several States and Territories respectively, shall be apportioned and charged in each State wherein the civil authority is thus obstructed, upon *all the lands and lots of ground therein respectively situated,* except such as are exempt by any law of the State or United States, as the said lands were enumerated and valued under the last assessment and valuation thereof. made under the authority of said State or Territory previous to the first day of January, 1861,".&c.*

The act then directed the appointment of *three* commissioners, for each of the States in insurrection, to execute its provisions; and it required this board to advertise for sale the parcels or lots, the taxes upon which were not paid within sixty days after the amount of the tax had been fixed, in a newspaper in the town, parish, district, or county where the property was situated, and also by posting notices in at least three public places in the town, parish, district, or county. In this advertisement or notice of sale, they were required by its 14th section to state "the amount or quota of said direct tax assessed against each tract or parcel of land . . . *together with a description of the tract to be sold."* The act required them further, in case the tax charged by the first section upon the lands, and apportioned to each lot, was not paid, to sell at public sale, those lots on which the tax remained unpaid after giving the already mentioned notice. It then provided that purchasers at such sales, after paying the purchase-money, should be entitled to receive from the commissioners their certificate of sale; and it enacted that the " certificate shall be received in all courts and places as *primâ facie* evidence of the regularity and validity of said sale, and of the title of the said purchaser or purchasers under the same."

On the 3d of March, 1865,† Congress passed another act declaring:

" That a *majority* of a board of tax commissioners shall have full authority to transact all business, and to perform all duties required by law to be performed by such board, and no proceed-

---

* 12 Stat. at Large, 422.                 † 13 Stat. at Large, 502.

ing of any board of tax commissioners shall be void or invalid in consequence of the absence of any *one* of said commissioners."

Under the act of the 7th June, 1862, three commissioners were appointed for South Carolina, who, after having made assessments, exposed the delinquent property to public sale, and on the 13th day of March, 1863, all of them having been present on that day, sold the lot now in dispute to the United States. A certificate of such sale was afterwards made out, signed by *two* of the commissioners, dated March 13th, 1865 (the act of the 3d of March, 1865, just above set out, being now in force), and given to the purchasers. It set forth that at a sale made under the act of Congress above noted, held pursuant to notice at Beaufort, in the State of South Carolina, on the 13th of March, 1863, the tract or parcel of land, the title to which was now in controversy, was sold to the United States for the sum of $125, the receipt of which it acknowledged. The defendants were mere tenants of the United States.

Whether this tax sale was valid and effective to divest the ownership of Mrs. O'Connor, and to vest the property in the United States, was the single subject of contest in the court below.

The declaration in the act was the ordinary one in trespass, *quare clausum fregit;* with an indorsement that "the action was brought to try title as well as for damages." The *locus in quo* was described as "in the town of Beaufort, and county aforesaid, containing eighty feet front, more or less, and in depth running from north to south, down to low-water mark, three hundred feet, more or less; butting and bounded north on Bay Street, south on the river, and east on the lands of the plaintiff; west on lands of the plaintiff." Plea, "Not guilty." The defence set up was, that the defendants entered and held the property as tenants of the United States, and that the United States had become owners by virtue of the tax sale already mentioned.

On the trial the plaintiff introduced evidence tending to show that for many years before the rebellion, she had owned

the lot described in the declaration, and owned it when the rebellion broke out; that in November, 1861, in consequence of the Federal fleet having arrived off Beaufort, and of her being informed of an order from the commander of the rebel forces, she with nearly all the other inhabitants of Beaufort, except colored persons, left the place; that after leaving Beaufort she resided in Columbia until it was burnt in 1865; that she never saw any advertisement nor received any notice, nor in any way became aware that any tax had ever been placed on her property by the government of the United States, until the close of the rebellion in 1865, when she discovered that her house and lot had been sold; and was in the possession of strangers.

The United States gave evidence tending to prove that when the three commisssioners appointed for South Carolina, entered upon their duties at Beaufort, they searched for records of the titles to lands there, through the town and parish, and also for the records of the assessment and valuation of the lots as the same were enumerated and valued under the last assessment and valuation thereof, made under the State of South Carolina previous to the 1st of January, 1861; that they could not find either the records (of titles) or the records of the State assessment and valuation, the same having been either destroyed, concealed, or lost; that the town and parish of Beaufort were at the time occupied by United States soldiers and a few colored people; that none or but few of the owners of the lands were present, having left the town prior to the entrance of the United States troops. But that they did find an old assessment-roll of the town of Beaufort and parish of St. Helena, and the comptroller-general's report of the State for the years 1857 or 1858. The old assessment-rolls and the comptroller-general's report for the State, in default of better evidence, were used as evidence in making up the judgment of the commissioners, although they were very indefinite, giving the names of the taxpayers and describing the property or land simply as so many "acres," without locating the same, and the lots in the town of Beaufort were described only as "town

lots," without any other description. The commissioners then proceeded to obtain all the evidence in their power as to the assessment and valuation of the lots of land both in the town of Beaufort and in the parish of St. Helena, and to value and assess the same in their own judgment upon such evidence. They found an old plat of the town of Beaufort of the date of 1799, by which it appeared that the town had been laid off into lots and blocks. But they found that many of the streets described were not opened, and also that additions had been made to some parts of the town, and that these parts were not on the plat. The commissioners finally all resolved that said plat should be used as a basis of description for their assessment-rolls, and ordered a survey of the additions to the town to be made, and thus made a new plat of the town of Beaufort. In the plat thus made by the commissioners the blocks throughout the town were designated by numbers, and the lots in each block by letters of the alphabet.

The commissioners then proceeded to value the property, using said plat as a basis for description, according to their best judgment, and the best evidence they could obtain.

The defendants gave evidence tending to show that the commissioners had made such advertisement and given such notices, so far as mode, time, and number of advertisement were concerned, as the act of Congress required. But it appeared that in these the description of the lot in controversy was thus made:

" The following is a description of said lands forfeited as aforesaid, together with the amount of the quota of said tax and penalty charged upon each of said tracts or lots of land respectively:

TOWN LOTS AND LANDS IN THE PARISH OF ST. HELENA.

| Lots. | Blocks. | Quota of Tax. | Penalty. | Amount. |
|---|---|---|---|---|
| E | 61 | $56 00 | $28 00 | $84 00 " |

The tax sale certificate already mentioned on page 393, having been offered by the defendants in evidence, the plain-

tiffs objected to it on the ground that it had not been spe-
cially pleaded. The court, however, overruled the objection,
and admitted the certificate. Being thus in proof, the court
ruled it defective and void, because signed but by two com-
missioners.

The court also instructed the jury, *as a matter of pure law
and expressly taking the consideration of the matter from them,*
that the advertisement was " not such a notice as the law
required." Having read the 14th section to the jury, and
referring to the advertisement, the court proceeded:

" It does not give notice, either directly or by implication;
that is, inevitable notice, so as to make the owner aware that
his particular property had been assessed, and was up for sale.
If it had said that the whole town of Beaufort was up for sale,
and by blocks and squares; a person was advertised that his
house was in that block or square, somewhere described by a
particular figure and letter, then it would be his duty to make
inquiry. But neither directly or indirectly, by necessary im-
plication, is this notice such as the law requires."

The court added:

" A notice published within military lines, is as it were a no-
tice only in a fortified camp. That notice, in point of fact, could
not be well supposed to reach the citizen."

The jury found for the plaintiff, and judgment being given
accordingly, the United States brought the case here.

*Messrs. W. W. Boyce and M. P. O'Connor, in support of the
ruling below :*

1st. The proceedings of the commissioners are not accord-
ing to the course of common law, but a special jurisdiction
and authority conferred by statute. It should appear, there-
fore, upon the face of the proceedings, that all has been done
which the law required should be done. The certificate is
thus fatally defective.*

2d. In an action of trespass to try title, the defendant

---

* Young *v.* Lorain, 11 Illinois, 636, 637; Thatcher *v.* Powell, 6 Wheaton,
119.

cannot justify under plea of the general issue. In such action any matter done by virtue of a warrant should be specially pleaded. A mere license to enter and occupy a close cannot be given in evidence under the general issue in an action of trespass to try-title.

3d. The act of Congress does not contemplate any certificate of purchase when the United States become purchasers. Practically, then, no injury was done to the defendants below by refusing to receive the certificate, as they could have recovered if their own evidence had not shown that the sale was void, by reason of failure in the tax commissioners to pursue the requirements of the law in the sale.

4th. That the so-called " description," even if it had been seen a hundred times, could, as a matter of fact, have given no notice to Mrs. O'Connor that it was *her* property which was to be sold, no one can deny. The commissioners get an old plot of the town, which designated streets, numbers of lots, and names of owners, and, without seeking information from any source, they proceed to survey and map out the town anew after their own fashion, and by the new plot, incomprehensible to every one but themselves, advertise and sell every lot in Beaufort. This notice would have been no notice to Mrs. O'Connor if she had been on the spot. And if there can be a notice less than none, this was so under *Dean* v. *Nelson*,* where it was held "that notice to parties within Confederate lines was not obtained by publication within Union lines." A "description," which the 14th section of the act expressly requires, means something more than " lot E, block 61," on a plot that no one but the commissioners ever saw. Description is the delineating a thing by a mention of its properties; in describing land, its length, breadth, and situation should be indicated. The property had metes and bounds, and is described by them in the declaration in this case. The worthlessness of the notice was so gross, so palpable in our case, that the court assumed it to be a question of law, as perhaps what amounts to a " description " truly is.

* 10 Wallace, 158.

*Mr. B. H. Bristow, Solicitor-General, and Mr. C. H. Hill, Assistant Attorney-General, contra.*

Mr. Justice STRONG delivered the opinion of the court.

When the certificate of sale was given in evidence by the defendants below, the Circuit Court ruled it to be void, because it was signed by only two commissioners, and this decision of the court is now assigned for error. It is obvious that the ruling was hurtful to the defendants. Had the certificate been admitted it would, by force of the statute, have amounted to *primâ facie* evidence as well of the regularity and validity of the sale as of the title of the purchasers. It would, therefore, have cast upon the plaintiff the burden of showing affirmatively that the sale was irregular and invalid, and that the title was not in the United States. And we think it was erroneously excluded. It is true that when an authority is given jointly to several persons they must generally act jointly, or their acts are invalid. This is a general rule for private agencies, though it is not universal in its application. But the rule is otherwise when the authority is of a public nature, as it was in this case. The commissioners were public agents, clothed with public authority. They were created a board to perform a governmental function, and it is a familiar principle that an authority given to several for public purposes may be executed by a majority of their number.* In one of the cases cited in the note† it was held that two of three trustees of a school district might issue a warrant for the collection of a tax, and that the presence of the third trustee at the issuing thereof would be presumed until the contrary was shown. The authorities cited are enough to show that the certificate of sale was not void or inoperative because signed by only two of the commissioners.

---

* Commonwealth ex rel. Hall *v.* Canal Commissioners, 9 Watts, 471; Jewett *v.* Alton, 7 New Hampshire, 253; Caldwell *v.* Harrison, 11 Alabama, 755; Williams *v.* School District, 21 Pickering, 82; Doe *v.* Godwin, 1 Dowling & Ryland, 259; The King *v.* Beeston, 3 Term, 592; McCoy *v.* Curtice, 9 Wendell, 19.

† McCoy *v.* Curtice, 9 Wendell, 19.

In addition to this there is also the act of Congress of March 3d, 1865,* in force when this certificate was given, under which, certainly, the validity of the certificate of sale is beyond doubt.

It has been argued, however, on behalf of the defendant in error, that inasmuch as the plea was only that of the general issue, the defendants were not at liberty to set up that the United States were the owners, and that they entered as tenants or licensees of the United States. It is doubtless true that a license from the plaintiff, or a justification under an incorporeal right, or an excuse of the trespass founded on fault of the plaintiff, or an entry by authority of law, with or without process, must be pleaded specially to an action of trespass. The reason is that these defences all admit the trespass and the possession of the plaintiff. But in trespass to real property, a freehold, or mere possessory right in the defendant, may be given in evidence under the general issue, though it is often advisable to plead *liberum tenementum.*† And there is a double reason for this when, as in this case, the action is brought by a plaintiff out of possession professedly to try the title. The action has then the nature of an ejectment, the plaintiff, if recovering at all, recovering possession as well as damages.

It has been further argued that the act of 1862 does not contemplate a certificate of sale in cases where the United States becomes the purchaser, but we are clearly of opinion that it does as fully as in any other.

The second assignment of error is, that the court instructed the jury the advertisement of sale was not such a notice as the law requires. The act of Congress required the board of commissioners to advertise for sale the parcels or lots, the taxes upon which were not paid within sixty days after the amount of the tax had been fixed, in a newspaper published in the town, parish, district, or county where the property was situated, and also by posting notices in at

---

* Quoted, *supra*, at the foot of p. 392.

† Proprietors of Monumoi Beach *v.* Rogers, 1 Massachusetts, 160; 1 Chitty's Pleading, 437 and 440.

least three public places in the town, parish, district, or county. The evidence given at the trial tended to prove that such advertisement had been made, and that such notices had been posted; nor was this contested. But the court held, and so instructed the jury, that the notice was not such as the law required. The reasons assigned for this ruling were that the advertisement did not state that the whole town of Beaufort was to be sold, and that, being a notice published within military lines, it was like a notice only in a fortified camp, and could not, in fact, be supposed to reach a citizen. We think, however, that neither of these reasons, nor any other not referred to, justified the court in ruling, as a legal conclusion, that the notice given in this case was not such as the law required. Whether the demands of the statute respecting notice of sale had been complied with was a mixed question of law and of fact, and it should have been submitted to the jury. Undoubtedly the advertisement must have been such as to inform persons who read it what property was intended to be exposed for sale. Any description that gave such information was sufficient. Whether the advertisement gave it or not depended not alone upon its contents. It was necessary to compare the description with the property described, and that was the province of the jury.

JUDGMENT REVERSED and a venire de novo awarded.