McFarland, J.,
delivered the opinion of the court.
The complainants are the heirs of Polly Wethered, deceased, and, as such, seek to recover by this bill a lot of about twenty and one-half acres of land near the city of Memphis, now in the possession of the defendant Woods.
Polly Wethered was a daughter of Anthony Bled-soe, Sr. On the 21st day of April, 1784, Anthony Bledsoe, Sr., entered in the office of John Armstrong, entry taker for the western lands of North Carolina, 500 ■ acres of land “joining Edwin Hickman’s south line and John Ramsey’s east line, on the Chickásaw Bluff, extending eastwardly.” Armstrong’s warrant, founded upon this entry, was issued to the surveyor to survey this land for Bledsoe, dated the 12th of January, 1785. The board of commissioners, created by the Act of 1819, to adjudicate the land claims of parties having claims under the State of North Carolina, considered this claim, and adjudged it valid on the 7th of June, 1820. On the 21st of March, 1821, William Lawrence, deputy surveyor, in compliance with the entry and warrant before referred to, surveyed the land and made out his certificate, which, with the plat, appears of record in the entry taker’s office of Shelby county. This survey purports to be founded upon the entry and warrant before referred to, and shows the boundaries of the land in range 8, section 1, on the 4th Chickasaw bluff, beginning on the east *268 boundary line of John Ramsey's 5,000 acre entry where the north boundary line of section 1 crosses the same, giving courses and distances. Previous to this, in 1788, Anthony Bledsoe had died, leaving a will, which was proven, and which, in substance, leaves his estate to be equally divided' among his children, eleven in number. It appears that Henry R. Bledsoe, one of his sons, procured the surveyor's location of the warrant in 1821, at considerable labor and under some difficulty; and about February 15, 1822, he made a written contract in his own name selling this land to Anderson B. Carr, and binding himself to convey the same to him. About the year 1826, or 1827, Anderson B. Carr filed his bill in the Chancery Court at Columbia against the four sons of Anthony Bledsoe, Sr., and their heirs, in which, in substance, he claimed that Henry R. Bledsoe was entitled to this 500 acres of land, partly on account of his services in locating the same, and also because it was not more than his share of the estate, and that under his written contract purchasing the same from Henry R. Bledsoe, he was entitled to the land. Commissioners were appointed, who reported that this 500 acre tract was Henry R. Bledsoe's share of the estate, and, thereupon, a decree was rendered vesting the title to the land in Carr. A bill of review was filed by the defendants in the cause, but this was finally dismissed in the Supreme Court in the year 1836. Polly Wethered was not a party to either of these causes, nor was .any of the daughters of said Anthony Bledsoe so far as appears. It seems to have been assumed that the landed estate *269 belonged to the four sons, and these proceedings were founded upon that assumption. Previous to this, in 1823, the land was sold for taxes and bought by said A. B. Carr, and on the fourth Monday of September, 1824, the sheriff and tax collector executed a deed for the land to Carr, which was duly registered.
The proof makes it reasonably certain that Carr held possession of the land, through himself or tenants, from about the time of his contract with Henry R. Bledsoe until his death, in 1849, without material interruption, claiming under his purchase from H. R. Bledsoe and his tax title. In January, 1846, Polly Wethered, her husband having died, instituted an action of ejectment in the United States Circuit Court for the district of West Tennessee, at Jackson, to recover of Carr her interest in said lands. In the meantime, no grant had ever issued in favor of the heirs of A. Bledsoe for this land. On the 10th of September, 1849, the defendant, H. B. S. Williams, entered the same land, and obtained a grant therefor on the 1st day of February, 1850. On the — day of October, 1853, a grant for the land issued in the name of Anthony Bledsoe, founded upon the entry before referred to.
On the — day of -, 1855, the action of ejectment of Polly Wethered against Carr was compromised, and a judgment rendered in favor of the plaintiff for one-eleventh of the 500 acres. At this time Polly Wethered was dead. She had died a year or two previous. No notice was taken of her death — probably'the fact was not known. Carr was also dead, but *270 the cause had been revived against his heirs. The judgment was founded upon an agreement signed by an attorney for the plaintiff and by the defendants. Previous to this a bill had been filed, and was pending in the court at Memphis, for a settlement of the estate of Carr, and for a partition of his lands. The record shows that after the judgment in the ejectment suit, the partition was made and the report of the commissioners recites the agreement of the parties, and proceeds to lay off to the heirs of Polly Wethered as their one-eleventh, lots 4, 5 and 11, and divide the balance among the heirs of Carr. The decree confirmed this report and vested the title in the Carr heirs. There is no formal vestiture of title in the Wethered heirs; they were not parties to this case.
Williams brought an action of ejectment against a number of parties holding other portions of the 500 acre tract under the Carr title, to test the strength of his grant; in this action he failed. After the partition, about 1857 or 1858, the lots being unoccupied, Williams took possession and put a tenant upon them, or part of them, or at least the proof seems to establish this, and about the year 1859, William L. Malone, husband of Sarah Malone, went also into possession, and put up a temporary cabin or cabins, and perhaps enclosures; whether their possession was full and complete does not appear. About the 17th of August, 1859, said William L. and Sarah Malone contracted with Williams to sell tc him their interest in the land for the price of $2,625, half in cash and half in ninety days; their interest *271 was described as one undivided 9th of lots Ros. 4, 5 and 11 — said Sarah being one of the nine children of Polly Wethered. They bound themselves to make a quit claim deed. On the 18th of August they executed a quit claim deed in pursuance of their bond, and delivered it to Messrs.. Poute & Small, their attorneys, to be delivered to Williams upon the payment of the money. Mrs. Malone was not privily examined touching the execution of bond or deed, nor was either registered. The deed was never delivered to Williams; nor does the proof show the payment of the money. Malone and wife are both dead; their heirs are among the complainants. Williams continued in possession by his tenants until about the - day of -, 1864, when he was dispossessed of lot No. 11, by J. D. Goff. Golf claimed title under a tax sale, made by certain commissioners appointed under an act of Congress, for the collection of direct taxes in the insurrectionary districts of the United States. Goff sold and conveyed to the defendant Woods, by two deeds — the first deed conveying an undivided half interest, and the other the remainder — both deeds made in 1865. Since that time Woods has been in possession of lot No. 11, the only one in controversy in this cause. The complainants are quite numerous and seem to have been scattered in different States. This bill was filed on the 25th of October, 1866.
It will not be practicable to notice fully all the questions that have been so ably argued upon both sides. We will attempt only to give our conclusions *272 upon such questions as are necessary in reaching a result. And first: Are the complainants entitled to relief as against the defendant Williams, leaving the defendant Woods out of view for the time being? It is argued that complainants have not established their right to claim the estate of Polly Wethered. In the bill, they put their claim both as heirs and de-visees (or their representatives) of said Polly. The Chancellor required them to elect, and they elected to show their title under the will. This it is insisted they failed to do. The will does not appear ever to have been proven in Tennessee, and it is argued that the statutes providing the manner in which foreign wills shall take effect, has not been complied with, that the will cannot be evidence of title to land in this State, and that we must take it for the present that Polly Wethered died intestate as to her estate in Tennessee. The complainants have shown themselves to be her heirs, and upon that ground may maintain the case. ’ As to the fact, all other questions aside, that under the order of the court, they elected to claim as devisees, it makes no differ-erence; the facts' appearing, they should not be turned out of court upon this ground. This we substantially held at Nashville, at the last term, in the case of Carr v. Lowe, 7 Heis., 84. So, either as heirs or under the will, the complainants are entitled to the estate of Polly Wethered, and we do not decide upon which ground, for it is immaterial, the result being the same in either event. The next, and vital «question, as between; these parties, is as to who has *273 the superior legal or equitable title to the land. Complainants’ claim is based upon the rights of Anthony Bledsoe, Sr. Under the facts already stated, Ids title was never ripened into a grant until 1853, and the time was not continuously extended (to perfect titles) under the various acts of the Legislature, and the grant was not obtained within the time limited by these acts. It is argued for "Williams, that as the Bledsoe grant was not issued within the time limited by these acts, this rendered the title invalid, and the land was subject to other entries, and Williams, having procured his grant, obtained the title.
In the case of Fogg v. Williams, 2 Head, 474, it was held that in relation to the lands held under a valid appropriation, under a North Carolina land warrant, the State of Tennessee occupies the position of trustee, and holds the legal title in trust for the owner, who must be regarded as having a vested right to the specific land appropriated, and that the State could not annex to this a condition that the right should be forfeited upon the failure of the owner to take out his grant within" a given time. The question, whether the State might do this as to land not claimed under North Carolina warrants, but alone under the title of Tennessee, was not decided ; and in that case it appeared that no grant had issued to the North Carolina claimant, and that a subsequent grantee, with constructive or actual notice, held the title in trust for the former. This authority has been earnestly assailed. The same doctrine was held in the case of Egnew v. Cochran, 2 Head, 320 — the *274 former opinion by Judge McKinney, the latter by Judge Wright. We have considered the argument urged against these cases, but we are content to follow them, not doubting that they are sound in principle, nor has any doubt been thrown upon their correctness by any subsequent cases of which we are aware. Again, it is argued that the authority of these cases only applies when the former entry is special, and. that this entry is not special.
The question is: Did the younger grantee have actual or constructive notice that the land had been previously appropriated? See 2 Head, 478. In this cause the entry was made in 1784, was surveyed in 1820, and Carr, claiming partly under the Bledsoe title, was in actual possession of the land for more than twenty-five years before Williams made his entry, and up to the time of his entry, and this within two and a half miles of the growing city of Memphis. Upon this it will not do to say that Williams had neither actual nor constructive notice of the appropriation of the land.
The next question is, as to the effect of Carr’s possession of the land upon the title of Mrs. Weth-ered, and the effect of the judgment in the ejectment suit. No doubt can exist but that Carr’s possession of the land for more than twenty years would raise the presumption of a grant, and give him a good title against all persons not under disability. The judgment in the ejectment suit, if valid, and the other facts in the record, seem to establish that Tolly' Wethered commenced her action of ejectment within *275 the time limited after her discoverture. The twenty years’ possession of Carr, although it raised a presumption of a grant, did not defeat her right. Nor was she affected by the chancery causes before referred to, as she was not a party thereto, nor was she barred by the statute of limitations. The result of this would be her right to recover against Carr, which it is said was done in the ejectment suit.
But it is argued that when this judgment was rendered Polly Wethered was dead, and the cause was not revived. The action was brought in the fictitious name of John Doe, lessee of Polly Weth-ered, in the common law form. The authorities seem to establish that in such cases the death of the lessor of the plaintiff does not abate the suit: Till-inghast’s Adams on Ejectment, 320, and authorities cited. It is true the compromise upon which the court acted, was signed in the name of Polly Weth-ered, by her attorney: this, however, was but matter of evidence. The record shows that a jury was em-panelled and a verdict found for the plaintiff. We cannot, therefore, in a collateral proceeding, pronounce the judgment void. What, then, was the effect of this judgment? This record makes it clear that the possession of Carr gave him a good title against all persons not under disability — so far as this record shows against all the world but Polly Wethered. What, then, is the effect of the recovery? It would not operate, independent of any other proof of title, to vest her with the title of Carr, but it may be looked to as evidence of right of possession, and to this extent *276 in support of title, as upon the entry, survey and grant the complainants have shown a prima fade right in their ancestor, this judgment was allowed as evidence that their title or claim was not then barred or lost by the adverse possession of Carr, and as an adjudication that the plaintiff was then entitled, as against Carr, to the possession. It being established, then, that at the date of this judgment in the ejectment suit the heirs of Polly 'Wethered were tenants in common with the heirs of Carr in the 500 acre tract, as owner of one-eleventh, how do they show that they are the owners in severalty of this one lot ? In the. suit between the heirs of Carr for partition, the Wethered heirs are not parties; but in that proceeding, the heirs of Carr cause this lot to be laid off to the Wethered heirs, and partition the remainder among themselves, and the decree vests the title in them accordingly. The Wethered heirs being already vested with a title of this lot as tenants in common, and the Carr heirs having caused themselves to be divested of title to it, it may very plausibly be said that this operated as a valid partition; but whether this be so or not,' is not now material to inquire; this will be a question between the complainants and the Carr heirs who are not parties to the case, and does not affect complainants’ right to recover.
We have said nothing with regard to the jurisdiction as to Williams. Clearly, the complainants had no remedy at law against him; he was not in possession, and, besides, there are clear grounds of equity jurisdiction.
*277 "We come now to consider the relief prayed for as against Woods. First. It is argued with great force that his demurrer to the jurisdiction should have been sustained; that this is in realty but an action of ejectment, depending alone upon the strength of title. The jurisdiction in the bill is placed mainly upon the ground that the grant of "Williams, and the pretended tax-title of Woods, are clouds upon the complainants’ title, which this court has the power to remove. It is said in the reply, and with much force, that this would enable a party out of possession to convert an action of ejectment into a bill in equity, by assuming that his adversary’s title papers are but clouds upon his title. This would, to a very great extent, break down all distinction between an action of ejectment and a bill in equity for the same relief. For the complainants, it is insisted that such is the effect of the latter authorities: Almony v. Hicks, 3 Head, 39; Ward v. Foster (not yet reported, opinion by Judge ISTelson). While we will not now say that such is the effect of that authority, yet it cannot be doubted that the tendency of the recent decisions is to modify the strictness of former rulings in this regard, and to hold that when parties have, at great trouble and expense, prepared a cause for trial, they shall not be turned out of court upon a doubtful question of jurisdiction.
We are of opinion, however, that the jurisdiction in this case may be maintained upon substantial grounds — that the remedy at law was not clear There-..is strong ground for saying, that as against *278 the complainants, Williams held the legal title under his grant. That grant having been issued prior to the Bledsoe grant, and under authority of the cases before referred to of Fogg v. Williams and Egnew v. Cochran, Williams held the legal title in trust for the complainants. This must be so, unless the result is changed by the adverse possession of Carr. This adverse possession of Carr, however, while effectual for other purposes, had no effect against Polly Wethered, by reason of her coverture, and from this it would result that, as to the interest of Mrs. Wethered the legal title was in Williams, upon the- facts stated, and therefore the complainants could not successfully maintain ejectment against Woods. There are other grounds upon which the jurisdiction may be maintained.
This brings us to the consideration of the title of Woods. He claims, as we have seen, under deeds from Goff, who purchased at the tax sale. It appears that upon the trial of the cause it was found by Woods, or his counsel, that through inadvertence they had failed to file the certificate given to Goff by the commissioners of the tax sale, which was the evidence of his title. When first applied to, after the cause was taken up for trial, the Chancellor said the certificate, if produced before the decision of the cause, would have the same effect as if produced then; but when produced, and objection fairly made by the complainants, it was excluded upon the ground that it was not filed in time under the rules of • practice. We are of opinion, that upon the affidavit showing reasons *279 why it was not filed sooner, the Chancellor should have permitted the certificate to be read. He should have so exercised his discretion upon these facts as to have heard all the evidence upon which the title depended. ¥e cannot, in this- respect, discriminate against this title because of its apparent want of merit, cfr of the harshness of the laws upon which it is founded. This certificate is in the record, and we must decide upon its effect. It purports to be a certificate of certain commissioners, that Goff had purchased this land at a tax sale made by them under the acts of Congress for the collection of direct taxes in the .insurrectionary districts, etc. The acts of Congress are the acts of the 5th of August, 1861, 7th of June, 1862, and 6th of February, 1863. The first act levied a direct tax of $20,000,000, apportioning the same among the several States; the second act provides for enforcing the collection of the tax in the insurrectionary States; the third mentioned act is amendatory of the former as to the manner in which the land shall be advertised and sold, for a certificate to be given to the purchaser, and its effect upon the title; which, in substance, is that this certificate shall be prima faoie evidence in all courts and places of the regularity of said sale, and of the title of the purchaser under the same; and, further, that the certificate shall only be affected as evidence of the regularity and validity of the sale by establishing the fact that the property was not subject to the tax, or that the tax had been paid previous to the sale, or that the land had been redeemed according to the *280 provisions of the act. Act of 1862, sec. 7, and act’ of 1863, sec. -.
It will be impossible to dispuss the various questions presented in argument. The final determination of'this question, arising under recent acts of Congress, properly belongs to another tribunal. We will therefore rest our determination of the question upon the following grounds:
First. That the land was not subject to the tax: This is one of the facts which the act provides may defeat the title. The 6th section of the act of 1862 provides, “ that • said board of tax commissioners shall enter upon the discharge of the duties of their office whenever the Commanding General of the forces of the United States, entering into any such insurrec-tionary district or State, shall have established the military authority of the United States throughout any parish, county or district of the same, and they shall open one or more offices for the transaction of business.” The sale was made the 16th of June, 1864. The proof of officers of the United States army shows that the city of Memphis was occupied by the United States forces, and, as we' know, had been for some time, their picket lines extending along the Memphis & Charleston Railroad, but in other directions extending but a short distance; and witness Morgan says, in substance, that a reconnoisance was occasionally sent into other portions of the county, but that the commissioners would not have been safe in going ten miles from Memphis without an escort, except along the Memphis & Charleston Railroad and *281 that he did not regard other portions of Shelby county any more under the military authority of the United States than other parts of- West Tennessee, except that it was closer to the United States force. We’ may, perhaps, judicially know that portions of West Tennessee during this time were disputed ground, and subject to the varying fortunes of war. We think it may be assumed that it was the purpose of this act, that no sales should be made in any county until the military authority of the United States was so established as to protect the citizens in visiting the headquarters of the commissioners to pay the tax, and to allow the free circulation of the mails, and to make it safe for the citizens of the county to obey the laws of the United States, which, we think, was not so in this instance. We may add, that in large portions of the State of Tennessee, the collection of this tax has never yet been enforced, having been suspended by authority.
Second. If we may go behind this certificate, we think the advertisement required, was not complied with. It would seem from the account we have been furnished of the unreported case, from the United States Supreme Court, of Cooly v. O’Connor, (since reported in 12 Wall., 391 — Ed.) that the question of advertisement is essential, notwithstanding the certificate. If so, we should hold the advertisement insufficient The act of Congress requires it to be published in a newspaper. In this case it was published in a supplement to the “Morning Bulletin,” a limited number of which were issued. It does not appear that it circulated in the same manner as the *282 paper itself. See Olcott v. Roberson, 20 Barbour, 148. The advertisement was in other respects irregular- and wholly insufficient.
Third. It may be doubtful if this certificate describes the land sufficiently. It shows the land is* in Shelby county, Tennessee, described as follows: Lot No. 11, 22 acres, A. B. Carr tract, assigned to H. B. S. Williams, Fourteenth civil district county. This is all. The record shows that Carr formerly owned other lands in this vicinity. The proof does not show that this land could be clearly identified by this description, if the certificate be taken as conclusive evidence of the facts recited; yet it must certainly describe the land, otherwise it is not the certificate contemplated. Without discussing other questions, we hold that this certificate does not establish Goff’s title. Again, we hold that Woods is not an innocent purchaser — for value, without notice — for many reasons.
. 1. He did not purchase from one having legal title, as we have already held. See Cray v. Leeper, 2 Yer., 193.
2. There is no proof that he paid the money.
Finally, we hold that the complainants are not barred by the statute of limitations. The adverse possession of Williams and Goff was not for a sufficient time to raise the bar, excluding the time when the courts were not open, in- accordance with the recent holdings of this court. Williams’ possession for part of the time was under a contract with Malone and wife, who were tenants in common with the other plaintiffs. Their contract, though void for *283 some purposes, would still have the effect to give Williams a possession rightful as against them, as tenants at will, and therefore not necessarily adverse to. the others, without proof of actual ouster.
Many questions have been argued, but they do not affect the merits, and we need not notice them.
The decree will be for the complainants, modified as to the exclusion of the tax certificate.