## DE TREVILLE *v.* SMALLS.

1. Where lands have been sold for an unpaid direct tax, the tax-sale certificate is, under the act of Feb. 6, 1863 (12 Stat. 640), *prima facie* evidence not only of a regular sale, but of all the antecedent facts which are essential to its validity and to that of the purchaser's title. It can only be affected by establishing that the lands were not subject to the tax, or that it had been paid previously to the sale, or that they had been redeemed according to the provisions of the act.
2. The ruling in *Cooley* v. *O'Connor* (12 Wall. 391), that the act of Congress contemplates such a certificate where the United States is the purchaser, reaffirmed.
3 The act of June 7, 1862 (12 Stat. 422), imposing a penalty for default of voluntary payment of the direct tax upon lands, is not unconstitutional. It reserved to the owner of them the right to pay the tax within a specified time, and take a certificate of payment by virtue whereof the lands would be discharged. On his failing to do so, the penalty attached.

ERROR to the Circuit Court of the United States for the District of South Carolina.

This is an action of trespass *quare clausum fregit*, brought by William J. de Treville against Robert Smalls, to try the title to a certain lot of ground in the town of Beaufort, S. C.

The plaintiff having made out a *prima facie* case, the defendant offered in evidence the following paper:—

"UNITED STATES OF AMERICA.

"*Tax-sale Certificate No.* 238.

"This is to certify that at a sale of lands for unpaid taxes, under and by virtue of an act entitled "An Act for the collection of direct taxes in insurrectionary districts within the United States, and for other purposes," held, pursuant to notice, at Beaufort, in district of Beaufort, in the State of South Carolina, on the thirteenth day of March, A.D. 1863, the tract or parcel of land hereinafter described, situate in the town of Beaufort and State aforesaid, and described as follows, to wit:—

"'Lot B, in block 23, according to the commissioners' plat,' was sold and struck off to the United States for the sum of fifteen dollars and —— cents, being the highest bidder, and that being the highest sum bidden for the same; the receipt of which said sum in full is hereby acknowledged and confessed.

"Given under our hands at Beaufort this second day of April, A.D. 1863.

"WILLIAM E. WORDING,

"WM. HENRY BRISBANE,

"*Commissioners.*"

To the introduction of which the plaintiff objected, on the ground,—

*First*, It is not in law a certificate, in this, that it does not, upon its face, show that those proceedings have been taken by the said commissioners prior to the alleged sale, which are essential to the regularity and validity thereof, and of which the act of Congress makes a purchaser's certificate *prima facie* evidence.

*Second*, It is not a proper and legal certificate under the act of Congress, because on its face it shows that the commissioners have not sold the plaintiff's lot of land according to the enumeration of said lot required by the act.

*Third*, Sect. 13 of the act of June 7, 1862, which, in case of the concealment or the loss of the records of assessments and valuation of the respective lots of land to be assessed, authorizes the commissioners to value and assess the same in their

own judgment, does not include the right to make a new and different enumeration and description of such lots.

*Fourth,* Said paper was not issued to any person, at said sale, bidding "the sum of the taxes, penalty, and costs, and ten per cent per annum interest on said tax," pursuant to the notice required by the act, nor to any person bidding "a larger sum," who, upon paying the purchase-money in gold and silver coin, or in the Treasury notes of the United States, or in certificates of indebtedness against the United States, "became entitled" under the act "to receive from the commissioners their certificate of sale," and said paper on its face purports not to have been issued by the commissioners to any "purchaser or purchasers," at a sale made under the seventh section of the act, and is not a purchaser's certificate of sale thereunder, but a mere memorandum that the land was struck off to the United States, and as such memorandum is not made evidence by the act, it is not competent evidence in law of the facts which it recites.

The court overruled the objections and admitted the certificate, to which ruling the plaintiff excepted.

The plaintiff, in reply to the evidence of the defendant, offered evidence to prove that the commissioners did not apportion and charge the said tax upon the said lot of ground as the same was enumerated and valued under the last assessment and valuation thereof made under the authority of the State of South Carolina previous to the first day of January, 1861, but did apportion and charge the said tax upon a lot enumerated and designated as lot B, in block 23. Upon inquiry by the court, the plaintiff said that he did not expect to prove that the records of assessment and valuation of the lot made under the authority of the State actually came within the possession of the board of commissioners previous to the making of their valuation and assessment as aforesaid.

To the introduction of this evidence the defendant objected, his objection was sustained, and the plaintiff excepted.

The plaintiff then offered evidence to prove that in the advertisement and notice of the sale of said lot the same was not described as it was enumerated in the last valuation and assessment thereof made under the authority of the State previous to the first day of January, 1861, and that in said advertisement

and notice the said lot was not described as the lot of said owner, nor by its situation and boundaries, nor as enumerated on the old plat of the town of Beaufort, nor by giving the streets and numbers thereon by which said lots were known and recognized, but by the enumeration and designation thereof as lot B, in block 23.

The court, on the objection of the defendant, excluded the evidence, and the plaintiff excepted.

The plaintiff then offered in evidence the following statement of W. E. Wording, one of the commissioners, to wit: "That the sales under act of Congress, 1862, for non-payment of taxes were advertised by the commissioner to be made at Beaufort. On the Saturday preceding the sale, General Hunter, commanding the military district in which the lands advertised were situated, issued an order forbidding the sale. The commissioners, notwithstanding the order, proceeded to sell, and on the day fixed by the advertisement, and at the hour fixed therein, struck off one lot. They then adjourned the sales from day to day, meanwhile reporting the matter to General Hunter, who finally consented not to interfere with the sale, and to revoke his order, but who did not formally revoke it; and under these circumstances the sales actually took place some time in March following,—about the 13th of March, — and after the first day of sale." He also offered to prove that during that period Beaufort County was under martial law.

To the introduction of which evidence the defendant objected, and his objection was sustained by the court; and the plaintiff thereupon excepted.

The testimony on both sides having been closed, the plaintiff requested the court to instruct the jury "that the act of Congress approved 7th June, 1862, under which the defendant claims his title, is in conflict with the fourth clause, ninth section, first article, of the Constitution of the United States, in that the amount of the direct tax theretofore apportioned to the State of South Carolina is increased by the addition thereto of a penalty of fifty per cent, and thus is not in proportion to the census or enumeration directed to be taken in the third section of the same article, whereby all direct taxes are to be

apportioned among the several States." But the court declined so to charge, whereupon the plaintiff excepted.

Judgment was rendered against the plaintiff, who thereupon sued out this writ, and assigns for error the rulings of the court below.

*Mr. Theodore G. Barker* and *Mr. James Lowndes* for the plaintiff in error.

*The Solicitor-General, contra.*

Mr. Justice Strong delivered the opinion of the court.

This case presents for our consideration the several acts of Congress of 1861, 1862, and 1863, which provided for the levy and collection of a direct tax, and the contest below was whether, under those acts, the defendant had obtained a valid title to the land in controversy. In support of his possession, he gave in evidence at the trial the tax-sale certificate, to the reception of which exception was taken, for several reasons, most of which are now urged in support of the assignments of error. It is said that the certificate is not evidence of title in the defendant, because it does not on its face show that those proceedings had been taken by the commissioners prior to the alleged sale, which were essential to the regularity and validity of the sale under the acts of June 7, 1862, and Feb. 6, 1863. This objection entirely overlooks the provisions of those acts of Congress. The certificate which by the act of 1863 the board of tax commissioners was required to give to purchasers was simply a certificate of sale. The law did not require it should set forth that a tax had been assessed upon the property; that the tax was unpaid; that the sale had been advertised for a specified time or in a particular manner; nor that it should recite any of the facts which were necessary antecedents to any sale. It made the certificate of sale equipollent with a deed, and cast upon the former owners of the land the burden of showing that the certificate or deed was made without authority. The numerous decisions cited by the plaintiff in error to support his objection are quite inapplicable to the case. No doubt it has been decided that statutes which make a tax-sale deed *prima facie* evidence of the *regularity* of the sale, do not relieve a purchaser from the burden of showing that the pro-

ceedings anterior and necessary to the power to make the sale actually took place. Such a provision has been held to relate only to the conduct of the sale itself. But the act of 1863 declares that the commissioners' certificate shall be *prima facie* evidence not merely of the *regularity* of the sale, but also of its *validity* and of *the title* of the purchaser; and it enacts that it shall only be affected as evidence of the regularity and *validity* of the sale by establishing the fact that the property was not subject to taxes, or that the taxes had been paid previously to the sale, or that the property had been redeemed. How can a deed be *prima facie* evidence of the *validity* of a sale, unless it be such evidence of the transmission of the title of the property? Is any sale *valid* which does not pass title to the subject of the sale? It may be regular in form and in the mode of its conduct, but it cannot be *valid*, unless authorized by law. Now, the act of Congress makes a certificate of sale by the commissioners evidence that the title acquired by the purchaser under the sale was a valid one, assailable only by proof of one or the other of three things. It is not the certificate of an assessment or of an advertisement of a sale, followed by an actual sale, to which such an effect is given, but a certificate of sale alone. We are not at liberty to interpolate in the statutes requisites for the certificate which the statute does not demand.

The second objection to the reception of the tax certificate is that it was not authorized by the statutes, inasmuch as it certified a sale to the United States. It is insisted that the effect of *prima facie* evidence is given only to certificates of sale made to the highest bidder, when such bidder was some person other than the United States, and that no authority was given to the board of commissioners to certify a sale when the government was the highest bidder, and when the property was stricken off to it. To this we cannot assent. The plain object of the statutory provision was to give confidence to purchasers, and thereby to enable the government to obtain the taxes due to it. For these purposes it was quite as important that the government should have evidence of its title, if it purchased, as it was that any other purchaser should have such evidence. Taxes, not lands, were what the government required. If the United States became the purchaser at the commissioners' sale,

it was only to obtain the taxes by a resale, and such a resale, resting as it must have done upon the original sale made by the commissioners, needed the encouragement and support of a commissioners' certificate equally with a purchase by any bidder. It is not, therefore, to be admitted that the statute intended to put the United States in any worse condition than that occupied by any other successful bidder. The argument that it is only that highest bidder who shall, upon paying the purchase-money (and not the United States, who of course do not pay so much as is claimed for taxes), be entitled to the certificate, is plausible, but we think it unsound. The words, " who shall, upon paying the purchase-money," &c., be entitled to this certificate, are not descriptive of the highest bidder entitled, but declaratory of the duty of every purchaser. It is, however, unnecessary to dwell longer on this part of the case. In *Cooley* v. *O'Connor* (12 Wall. 391), we held that the act of Congress did contemplate a certificate of sale in cases where the United States becomes the purchaser, as fully as where the purchase is made by another. In that case, the point now made was distinctly presented, and such was our judgment. We adhere to the opinion we then expressed.

The other reasons urged in support of the objection to the admission of the tax certificate of sale may be considered in connection with the first exception to the rejection of evidence. In substance, they are that the certificate was not legal, because on its face it shows the commissioners did not sell the plaintiff's lot according to the enumeration thereof required by the acts of Congress ; and to show that such was the fact, the plaintiff offered evidence which was rejected by the court. What was sold was lot B, " according to the commissioners' plat." Now, if it be assumed, as it must be, in view of the evidence offered, that the enumeration and valuation of lot B was not in accordance with the last assessment and valuation made under authority of the State previous to Jan. 1, 1862, we do not perceive that it affects the validity of the title acquired by the purchaser at the sale. It was foreseen by Congress that the State records of assessments and valuation of the lots of land in insurrectionary districts might be destroyed, concealed, or lost, so as not to come into the possession of the board of

commissioners, whose duty it was to enforce the collection of the tax, and therefore it was enacted by the thirteenth section of the act of 1862 that they should be authorized to value and assess the same upon such evidence as might appear before them, and it was declared that " no mistake in the valuation of the same, or in the amount of tax thereon, should, in any manner whatever, affect the validity of the sale of the same, or of any of the proceedings preliminary thereto." The provisions respecting the mode of valuation were only directory. But if they were more, so far as relates to the admissibility of the certificate of sale, the requisition of the first section of the act was quite immaterial. That certificate was made *prima facie* evidence of the regularity and validity of the sale and of the title of the purchaser irrespective of any recitals it might contain, or of any evidence which might afterwards be adduced to rebut the *prima facies*. It was presumptive evidence of all antecedent facts essential to its validity, and hence admissible as such. The only question, then, is whether the evidence offered tended to rebut this presumption.

Assuming the evidence would have proved that the commissioners did not apportion the tax upon the lot as the same had been enumerated and valued by the State in the last assessment prior to Jan. 1, 1862, their action was at most a mere irregularity, and the evidence by itself did not prove that. The act authorized the board to assess and value lots of ground according to their own judgment, when the State records of valuation and assessments were destroyed, concealed, or lost, so as not to come into their possession. It is a fair presumption that they discharged their duty according to law. The plaintiff did not offer to show, and disclaimed any intention to show, that the State records of assessment and valuation came into the possession of the commissioners previous to their making the valuation and assessment; and in view of the history of the times, to which we cannot close our eyes, it was a reasonable presumption which the jury ought to have accepted, that the State assessments and valuations were withheld or concealed. They were, of course, in the hands of the insurrectionary State government, and hence inaccessible to the commissioners. The evidence offered had no tendency to show the contrary. As we

have seen, the act of Congress declared that no mistake in the valuation or in the amount of the taxes would in any manner affect the validity of the sale, or of any of the proceedings preliminary thereto. Besides, all possible attack upon the *prima facies* of the certificate was limited by the express provisions of the act, which enacted, as before stated, that it should only be affected as evidence of the regularity and validity of sale, by establishing the fact that the property was not subject to taxes, or that the taxes had been paid previous to sale, or that the property had been redeemed. This left to the owner of lands subject to the tax every substantial right. It was his duty to pay the tax when it was due. His land was charged with it by the act of Congress, not by the commissioners; and the proceeding ending in a sale was simply a mode of compelling the discharge of his duty. All his substantial rights were assured to him by the permission to show that he owed no tax, that his land was not taxable, that he had paid what was due, or that he had redeemed his land after sale. He was thus permitted to assert every thing of substance, — every thing except mere irregularities.

We do not feel at liberty to disregard the plain intention of the acts of Congress. We are not unmindful of the numerous decisions of State courts which have construed away the plain meaning of statutes providing for the collection of taxes, disregarding the spirit and often the letter of the enactments, until of late years the astuteness of judicial refinement had rendered almost inoperative all legislative provisions for the sale of land for taxes. The consequence was that bidders at tax sales, if obtained at all, were mere speculators. The chances were greatly against their obtaining a title. The least error in the conduct of the sale, or in the proceedings preliminary thereto, was held to vitiate it, though the tax was clearly due and unpaid. Mr. Blackwell, in his Treatise on Tax Titles, says (p. 71), " that out of a thousand cases in court [of tax sales], not twenty have been sustained." To meet this tendency of judicial refinement very many States have of late adopted very rigid legislation. The acts of Congress we are considering must have had it in view. Hence the stringent provisions they contain. They declare, in effect, that the certificate of

the commissioners' sale shall be evidence of compliance with the preliminary requisites of the sale, and that this evidence shall be rebutted only by proof of one or the other of three specified things. There is no possible excuse for not enforcing such statutes according to their letter and spirit. In *Gwynne* v. *Neiswanger* (18 Ohio, 400), it appeared that the statute of the State prescribed certain preliminaries to a sale of land for taxes, and directed a deed to be made to the purchaser, which should be received in all courts of the State as good evidence of title, adding, " nor shall the title conveyed by said deed to the purchaser or purchasers, his heirs, or their heirs, assignee or assignees, be invalidated or affected by any error previously made in listing, taxing, selling, or conveying said land." The court held that even if there were irregularities in the proceedings, they would not justify declaring invalid a deed which the law under which it was made enacted should not be invalidated for any error in the listing, selling, or conveying.

In *Allen* v. *Armstrong* (16 Iowa, 508), we find a construction of another State statute. It enacted that a county treasurer's deed for land sold by him for taxes should be *prima facie* evidence, 1st, that the property conveyed was subject to taxation ; 2d, that the taxes were not paid; 3d, that the property conveyed was not redeemed; and should be conclusive evidence of the following facts: 1st, that the property had been taxed and assessed as required by law ; 2d, that the taxes were levied according to law ; 3d, that the property was advertised for sale in the manner and for the length of time required by law; 4th, that the property was sold as stated in the deed ; 5th, that the grantee was the purchaser; 6th, that the sale was conducted as required by law; and, 7th, that all the prerequisites of the law were complied with by all the officers, from the listing and valuation of the property up to the execution of the deed, and that all things whatsoever required by law to make a good and valid sale, and to vest the title in the purchaser, were done, except in regard to the three points first above named, wherein the deed should be *prima facie* evidence only. This, it will be noticed, was substantially the same as the United States statute, and the court ruled that irregularities preced-

ing the sale were inoperative to defeat it. The case is in
many particulars instructive. See also *Tharp* v. *Hart*, 2 Sneed
(Tenn.), 569.

In regard to the assignment of the plaintiff, that the court
erred in refusing to admit evidence of the order of General
Hunter and its revocation, as well as of the fact that Beaufort
County was under martial law when the sale was made, it is
sufficient to say that we cannot perceive its possible legitimate
bearing upon any question really involved in the case, and the
assignment has not been seriously pressed.

Nor was there error, of which the plaintiff can take ad-
vantage, in refusing evidence to prove that the advertise-
ment and notice of the sale did not describe the property
sold as it was enumerated in the last preceding valuation.
What we have heretofore said is a sufficient answer to this
objection.

One other assignment only remains. It is that the acts of
Congress were unconstitutional, because the amount of the
direct taxes apportioned to the State of South Carolina was
increased by the addition thereto of a penalty of fifty per cent,
and therefore was not in proportion to the census or enumera-
tion directed to be taken by the second section of the first arti-
cle of the Constitution.

The assignment rests upon a mistaken construction of the
acts of Congress. It is true that direct taxes must be appor-
tioned among the several States according to the population.
The acts of Aug. 5, 1861, June 7, 1862, and Feb. 6, 1863, did
so apportion the tax. The fifty per cent penalty was no part
of it. The act of Congress of 1861, which levied the tax, pro-
vided for no penalty, except for failure to pay it when it was
due; and the penalty charged by the acts of 1862 and 1863
was also for default of voluntary payment in due time. A
careful reading of the acts makes this very plain. Through-
out, a distinction is made between the tax and the added
penalty. It is recognized in the first section of the act of
1862, in the second, and in the third, as well as elsewhere.
By the third section the owner of the lots or parcels of land was
allowed to pay the tax charged thereon (*not the tax and pen-
alty*), and take a certificate of payment, by virtue whereof the

lands would be discharged. It cannot, therefore, be maintained that the tax was in conflict with the Constitution.

We have thus considered all the questions presented by the record, and we discover no error.

*Judgment affirmed.*

MR. JUSTICE FIELD dissented.