## THE STATE OF SOUTH CAROLINA v. PINCKNEY.

### SAME v. DAVIS.

1. Entries of surveys and sales from the original books of the commissioners of United States tax sales would seem to be admissible to show what was sold, although not to impeach the regularity and validity of the sale; but not having been considered by the Circuit judge, his admission of such testimony cannot be assigned as ground for a new trial.

2. Where information is brought by the State for the recovery of real property from an individual, the State is not required to prove her title; she is the sovereign, the source of title, and upon this *prima facie* showing she rests until it is removed by a counter showing.

3. Statutes of limitation, affecting only the remedy, constitute no exception to the general rule that laws operate only upon matters which arise after their passage, unless they otherwise expressly declare.

4. The limitation of time within which the State will sue, adopted in 1870, cannot affect this action under the facts of the case.

5. A deed that calls for boundaries on tidal navigable streams conveys the land down to the ordinary high water line only.

6. Under a certificate of sale of island lands by United States tax commissioners, the vacant marshes surrounding such island, being property of the State and therefore not taxable under the act of Congress,

did not pass; and evidence may be introduced to show the State's ownership.

7. A judgment for the recovery of land is not voidable for uncertainty because that it will be necessary to make a location of the property designated.

8. The Circuit judge's ruling that the trespass by defendant was not wilful, not disturbed; and *doubted* whether this court has the right to review a finding of fact in a case of this character.

Before WALLACE, J., Beaufort, November, 1883.

These were informations filed September 20, 1882, by LeRoy F. Youmans, then attorney general, in the name of the State of South Carolina, one against C. C. Pinckney, jr., and the other against W. B. Davis, for the recovery of certain salt marshes alleged to be the property of the state.

At the trial, plaintiff offered in evidence certified copies of entries of surveys and sales from the original books of A. D. Smith, W. E. Wording, and William Henry Brisbane, of their surveys and sales made as United States tax commissioners during the years 1864 and 1863, under and by virtue of an act entitled "an act for the collection of direct taxes in insurrectionary districts within the United States, and for other purposes." Defendant objected to this evidence on the ground that the commissioners' tax sale certificate is *prima facie* evidence of title to the premises described therein, and that the papers offered are not competent testimony to rebut the same. The judge did not consider this evidence in making his decision, but thought it admissible as throwing light upon the question, what did the commissioners sell?

The case is otherwise fully stated in the Circuit decree and in the opinion of this court. The Circuit decree in the *Pinckney case* was as follows:

A body of land composed partly of highland and partly of marsh, lies in Beaufort County, and is bounded on the north by Coosaw River and St. Helena Sound, on the east by St. Helena Sound and Morgan River, and west by Parrott Creek and Coosaw River. It is penetrated by two creeks—Safe Harbor Creek, from St. Helena Sound on the north, and Bass Creek from Par-

rott Creek on the south. These creeks lose themselves in the marsh. The largest piece of highland lies upon the southern side of the body, and is bounded by Morgan River on the south, on the north by Safe Harbor Creek and salt marsh, and on all other sides by salt marsh. The balance of the highland is small islands—some in the eastern and some in the western part of the main body—each of which is surrounded by salt marsh.

On June 4, 1787, a grant was issued by the state to William Fripp of "a plantation or tract of land containing one hundred and twenty acres of salt marsh and eight small islands, situate in the district of Beaufort, in St. Helena parish, bounding south on St. Helena River, commonly called Morgan River, west on Parrott Creek, north on vacant marsh, eastward on marshes from William Fripp's land, commonly called Morgan's Island, showing such shape, form, and marks as are represented by a plat hereunto annexed." The plat referred to, dated April 18, 1787, is in evidence. It describes one hundred and twenty acres of salt marsh and eight small islands situate on the southwestern part of the main body.

On July 2, 1787, another grant was issued by the state to William Fripp, conveying to him "a plantation or tract of land containing thirty (being nine small islands) acres, situate in the district of Beaufort, in St. Helena parish; three of the islands bound westwardly on Safe Harbor Creek, the other six islands all sides on marsh lands, having such shape, form, and marks as are represented by a plat hereunto annexed." This plat, dated April, 1787, is in evidence. It describes nine small islands upon the eastern part of the main body. For the largest body of highland, that bounded on the south by Morgan River, no grant is produced. It is referred to in the grant of June 4, 1787, mentioned above, as "William Fripp's land, commonly called Morgan's Island," and it is conceded that William Fripp had title to this land.

Thus stood the title to this property, as far as appears from the evidence, until March 10, 1863. On that day, under "an act for the collection of direct taxes in the insurrectionary districts within the United States, and for other purposes," the United States commissioners sold and conveyed to Edward S.

Philbrick "the tract of land known as Morgan Island, bounded northerly by Coosaw River, southerly by Morgan River, easterly by St. Helena Sound, westerly by Parrott Creek, containing two hundred and fifty-five acres, more or less." This description is taken from the tax sale certificate which is in evidence.

On January 27, 1865, E. S. Philbrick conveyed the same land to Geo. M. Wells. In January, 1867, Geo. M. Wells executed to E. S. Philbrick a mortgage of the same land. In pursuance of a judgment of foreclosure of the above mortgage, the same land was sold and conveyed by Alfred Williams, sheriff of Beaufort County, to Louis A. Phillips on December 22, 1869. On February 4, 1871, Louis A. Phillips conveyed to Theodore G. Eiswald "all that plantation or tract of land * * * known as Morgan Island, bounded on all sides by the waters and marshes of St. Helena Sound and of Coosaw and Morgan Rivers, measuring and containing eight hundred acres, more or less." Eiswald conveyed to W. B. Davis "that piece, &c., * * * known as Morgan's Island, bounded on all sides by waters of Coosaw River, St. Helena Sound, Morgan River, and Parrott Creek, measuring and containing four hundred acres, more or less."

On August 29, 1879, W. B. Davis executed a quit-claim deed to C. C. Pinckney, jr., of all his interest in "all that piece or parcel of land situate, lying, and being in the County of Beaufort and state aforesaid, being the northwestern portion of the island known as Morgan Island; bounded on the north by Coosaw River; on the east and south by a line beginning on Parrott Creek, forty-five chains to the southward of the mouth of Bass's Creek, and running north by forty-five degrees east (N. 45° E.) to Coosaw River or St. Helena Sound; and on the west by Parrott Creek, as indicated on the map of the United States Coast Survey of the entrance to Bull and Combahee Rivers, No. 435, A. D. 1871, attached to and made a part of this deed, and containing two thousand acres, more or less."

These deeds, from the tax sale certificate down to and including the deed of Davis to Pinckney, together with the state grants to Fripp, constitute all the paper title put in evidence.

This information was filed by the state to recover the marsh land included within the boundaries of Parrott Creek, Coosaw River,

St. Helena Sound, and Morgan River; the state conceding that the highland has been granted and so much of the marsh as is granted in the grant of June 4, 1787, to William Fripp.

To the demand of the state, the defendant opposes three grounds of resistance: 1. That in this action the state, to be entitled to recover, must show title affirmatively, and has failed to do so; 2. That the state is barred by the statute of limitations of actions by the state. 3. That defendant has title under a tax sale certificate issued under the laws of the United States.

It is hardly necessary to say that the state can only be brought into court with her own consent, and when she voluntarily comes into any of her own courts to assert a right of property, she is of course bound by the rules established there for the administration of justice between individuals, and to recover a demand must establish her right by proof. Has she done so in this case? The state at the close of the revolutionary war succeeded to the territorial rights of the British crown, and became the owner in fee of all the lands within her limits vacant at that time. She has no paper title; she acquired her right by the strong hand, and her title has been conceded by the British crown, the former owner by right of discovery and conquest. These are historical facts, of which the court will take judicial notice, and need not be formally proven. As to the right of the state as successor to the British crown, see 3 *Kent Com.*, 377.

That salt marsh has for one hundred years been considered by the general assembly of this state as such land as when vacant was owned by the state, appears from the act of 1784 (4 *Stat.*, 627) to raise supplies. By this act "all lands granted by the state" were classified and rated for taxation. This classification was continued from year to year in the annual acts to raise supplies, until the year 1815. In that year an act to fix the value of lands in the state for taxation, &c. (6 *Stat.*, 7), was passed. In all these acts salt marsh is included as taxable when granted. In addition to this, the state has from ancient times actually exercised the power to grant lands of this description without question. See act of 1787 (5 *Stat.*, 39, § 4); and act of 1836 (7 *Stat.*, 151). See also grant of marsh land to William Fripp in 1787, in evidence in this case. From this it appears that

there is nothing in the fact that land is marsh land to affect the nature of the state's tenure of the soil.

It thus appears that the state has title to all the ungranted land within her territorial jurisdiction. How is this to be made to appear when the state undertakes to establish such right? When an individual brings an action to recover the possession of land, the rules of evidence require that he should prove a *prima facie* title by showing that he has the title of the state. This is done by the production of a grant, or by proving such a possession as raises the presumption of a grant. He is not required to formally prove the title of the state under whom he holds. That is presumed. The rule admits the title of the state, and it is matter for judicial cognizance, without proof. So when the state brings her action to recover land on the strength of her title, she invokes the rule just referred to as obtaining between individuals, and asks that the court take judicial cognizance of the historical facts upon which her title rests. To push the resemblance between what is required as between individuals and the state and individuals a little further, when the individual plaintiff rests upon the right of the state as source of title conveyed to him by grant, the burden of proof is shifted to the defendant, who must then show, to defeat plaintiff's recovery, that the title of the state is really not in plaintiff. Thus a successful defence, too, must rest upon the presumption of the state's title.

It appears, then, that the presumption of the state's title is a rule of evidence that applies whenever title and jurisdiction are asserted by the pleadings by the state, and where a grant from the state, either actual or presumed, is set up by an individual, and is sufficient in either case to put the defendant upon his defence. In New York a more stringent rule has been adopted. Under their statute of limitations of actions by the state to recover land, it has been held that in addition to the presumption of title in the state to entitle herself to recover, she must prove that the land claimed has been vacant within the statutory period. See *People* v. *Rector of Trinity Church*, 22 *N. Y.*, 46, and numerous cases which need not be cited here. While this rule appears to be exacting and requiring the overthrow of matter of

defence before it is set up, and against principle, it need not be discussed here, for reasons that will appear hereafter.

From the foregoing, it appears that the same rules that govern the procedure between individuals in actions to recover land are applied to the state as well when in a similar relation; the same presumption applying equally to both. Our cases upon this subject are *State* v. *Arledge*, 1 *Bail.*, 551, and 2 *Bail.*, 401; *Trapier* v. *Wilson*, 2 *McC.*, 191.

The state then having a *prima facie* case, is she barred by the statute of limitations? It has long been settled that statutes of limitation do not run against rights of the state unless it is expressly provided that they shall. No statute of limitation upon the state's right was ever enacted in this state until 1870. This statute provides that the state will not sue after forty years from the accrual of her right. This was amended in 1873, reducing the time beyond which actions by the state would not be brought to recover land to twenty years. This latter statute has been re-enacted in the revised code of 1882. All along, from the first enactment of the statute in 1870 down to the last, a provision has been preserved (see *Code of* 1870, § 96) to the effect that such limitation shall not extend to actions already commenced, or to cases where the right of action has already accrued.

The defendant went into possession in 1879, and traces title and claims under the United States tax sale certificate of the date of 1863. There is nothing to show adverse possession, or such trespass as indicated a claim and thus gave currency to the statute and right of action to plaintiff upon any part of the disputed territory outside of the grants to William Fripp prior to 1863. This action was commenced in September, 1882. No right of action then accrued until 1863. If either of the statutes of limitation above referred to had been of force in 1863, it is obvious that this action would not be barred by them, the least time (twenty years) not having run out.

If, however, in accordance with the New York rule, the plaintiff should be required to show affirmatively that his right of action accrued within the time limited by the act, the testimony submitted by him, both negative and positive, is full to the point.

To show that the right of action of plaintiff accrued within the twenty years, the witnesses, Windsor, Pengelly, and Freland, all testify that the salt marsh was vacant in 1877. White testifies that Davis, defendant's grantor, refused to receive pay for rock dug in the marshes in 1879. The grants to William Fripp are bounded on rivers and vacant marsh, and therefore do not include such marsh as they are bounded on, nor such parts of the shores of the tidal navigable streams as are covered by water at ordinary high tides. There is no proof in rebuttal of this testimony which shows vacant and unoccupied and unclaimed marshes within the statutory period, and brings this action within the scope of the stringent New York rule above referred to.

The defendant sets up as a defence, and claims title to the disputed land under the United States tax sale certificate above referred to. The chain of title from this certificate has already been set out. This certificate, in effect, declares that under "an act for the collection of direct taxes in insurrectionary districts within the United States, commissioners sold and conveyed to Edward S. Philbrick" the tract of land known as Morgan's Island, bounded northerly by Coosaw River, southerly by Morgan River, easterly by St. Helena Sound, westerly by Parrott Creek, containing two hundred and fifty-five acres, more or less.

In the case of *De Treville* v. *Smalls*, 98 *U. S.*, 522, the Supreme Court of the United States held that such certificate "shall be *prima facie* evidence, not merely of the regularity of the sale, but also of its validity, and of the title of the purchaser." The same case held further, that "all possible attack upon the *prima facies* of the certificate is limited by the express provisions of the act, which enacted that it should only be affected as evidence of the regularity and validity of the sale, by establishing the fact that the property was not subject to taxes, or that the taxes had been paid previous to the sale, or that the property had been redeemed." It will not be necessary to quote from the acts of Congress, as this citation from the opinion of the court embraces all that is material to the question under consideration.

The legality of the sales, evidenced by these certificates, having been affirmed by the Supreme Court of the United States (see *De Treville* v. *Smalls*, *supra*), the only question in connection

with this certificate is, what did it convey? It describes the property conveyed as Morgan Island, and bounds it by certain great navigable tide-water streams. It is not described as the property of Fripp. If there is land within the descriptive boundaries that at the time of the sale belonged to the state, that land was not subject to taxes, and was not and could not, therefore, be conveyed by the certificate under the citation from the act of Congress in the quotation from the opinion in *De Treville* v. *Smalls*, *supra*. According to that case (the lands of the state not being subject to taxes), the title of the state was not affected by the sale and certificate.

In this connection, therefore, the important question is, did the state own any land within the descriptive boundaries mentioned in the certificate? and if so, what were its boundaries? A conveyance which calls for, as boundaries, navigable streams in which the tides ebb and flow, carries the title of the grantee to the line reached by the water at ordinary or daily high tide, as distinct from high spring tides or ordinary spring tides. This rule is distinctly described and established in the case of *U. S.* v. *Pacheco*, 2 *Wall.*, 590. Therefore the marsh land, between low water and ordinary high water, was not conveyed by the certificate. If it has not been conveyed by the state, it is still the property of the state. Any other land within the description, that had not been conveyed by the state, was the property of the state at the date of the certificate, and was not, therefore, conveyed by the certificate. The grant, therefore, of June 4, 1787, to William Fripp, conveys one hundred and twenty acres of *salt marsh*, and eight small islands, bounded south on St. Helena River, commonly called Morgan River, west on Parrott Creek, north on vacant marsh, eastward on marshes from said William Fripp's land, commonly called Morgan Island.

It will be observed that this grant conveys marsh which is bounded by vacant marsh and by great navigable tide water streams, and also conveys eight small islands as included in the marsh. It is obvious that the word "island," when used in this grant in relation to the small islands, signifies highland, and when in the same paragraph William Fripp's land is spoken of as Morgan's Island, it is impossible to resist the inference that there,

too, it was used to signify the same thing, and meant highland. This inference is strengthened by the words, "on marshes from William Fripp's land." If it had been intended to include marshes as part of Morgan's Island, the grant would have called for Morgan Island as a boundary instead of the "marshes from" that island. This grant, by calling for these marshes as a boundary, excludes them from the grant. By calling for Morgan River, Parrott Creek, and St. Helena Sound as boundaries, the ground covered by these rivers at ordinary high tide is excluded from the grant. By calling for vacant marshes on the north while conveying marsh excludes all marsh not included in the one hundred and twenty acres conveyed. This same grant recognizes William Fripp's title to Morgan Island, that is, to the highland called in the grant Morgan's Island, and this is the only evidence that the title to that land had passed out of the state.

The quit claim deed of Davis to defendant, described above, includes much if not all the marsh and highland granted by the grant of June 4, 1787, as well as the marsh described as vacant and lying on the north of the one hundred and twenty acres. As the title to the land conveyed by Davis to Pinckney had never been conveyed by the state, except the one hundred and twenty acres of the grant of 1787 (to all the land except the one hundred and twenty acres), the state now has title and is entitled to recover it.

The title of the state to all the land within the boundaries claimed by defendant is absolute, except to so much of it as is embraced in the grant of 1787 to William Fripp. To ascertain, therefore, the exact physical boundaries of the land of the state, it will be necessary to locate this grant by a survey to be made according to the findings of the decree. For the phosphate rock and phosphatic deposits taken by defendant from land lying outside of this grant the state would be entitled to recover damages. As the defendant mined the rock under color of title there was no wilful trespass, and the measure of damages would be the value of the rock, less the cost of rendering them marketable. In the present state of the evidence, however, it is impossible to tell what amount of rock has been mined upon the land of the state

and how much taken from the one hundred and twenty acres for which the state would not be entitled to damages. These questions can be settled in the further progress of the case.

It is therefore ordered, adjudged, and decreed, that plaintiff is entitled to recover from the defendant all the land within the limits claimed by him, except the one hundred and twenty acres granted by the state in 1787 to William Fripp, and is also entitled to recover damages, according to the principle stated in this opinion upon that subject, for all phosphate rock and phosphatic deposits mined and taken by defendant from the land adjudged herein to be the property of the state. It is further ordered that the parties, or any of them, have leave to apply at the foot of this decree for all necessary orders to carry it into effect.

In the *Davis case* the Circuit decree was as follows:

A decree in the case of *The State of South Carolina against C. C. Pinckney, Jr.*, has just been signed by me. This case involves precisely the same principles as that, and what is said there need not, therefore, be repeated here. The information there was filed to recover the marsh land upon the western end of the same body upon the eastern end of which the marsh land lies that the information here was filed to recover.

It may be said here, generally, that the state is the owner of all the land in the state that has not been granted by herself, or by former owners, before her title accrued. On the eastern end of the body of land bounded on the north by Coosaw River and St. Helena Sound, and on the south by Morgan River, and on the east by Parrott Creek, there are nine small islands, containing in the aggregate thirty acres, bounded on all sides by marsh. These islands were granted to William Fripp by the state on July 2, 1787, and described in the grant as follows: "A plantation or tract of land containing thirty (being nine small islands) acres, situate in the District of Beaufort, St. Helena Parish; three of the islands bound westwardly on Safe Harbor Creek, the other six islands all sides on marsh land." The plat of the same gives the same description. The title to the state, therefore, to these islands has passed away from her. The grant, however, calling for the surrounding marsh as a boundary of the land con-

veyed, excludes the marsh from the grant, and there is nothing to show that the title of the state to that has been granted.

The tax sale certificate does not convey this marsh, for the reasons stated in the decree in the case of *The State* v. *Pinckney, Jr.*, above referred to. It is also in proof that these marshes have not been occupied or held adversely, and were, therefore, vacant prior to 1863. There is no proof that defendant has taken any minerals from the marshes or otherwise injured the property.

It is therefore adjudged that the State of South Carolina is the owner, and is entitled to recover all the marsh land described in paragraph 47 of the information.

*Messrs. Hayne & Ficken,* and *Wm. Elliott,* for appellants.

*Messrs. Smythe & Lee,* contra.

April 21, 1885.   The opinion of the court was delivered by

MR. JUSTICE McGOWAN.   These cases, depending upon the same facts and principles, were heard together and they will be considered together.   The attorney general in behalf of the state, filed an information against each of the defendants on September 20, 1882, for intrusion into certain salt marsh lands adjacent to and surrounding Morgan Island, and digging, mining, and removing phosphate rocks and phosphatic deposits from said territory, the property of the state.   The defendants each answered, denying that said territory or any part thereof was the property of the state; and pleading "that no right or title in or to the territory described in the information accrued to the state within the space of forty (40) years next before the commencement of this action, and that if any such right or title ever accrued to said state, the same accrued more than forty (40) years before the time of the commencement of this action; and neither the said state nor those from or under whom it claims have received the rents and profits of said territory or of any part thereof within the space of forty (40) years before the commencement of this action."   It was referred to Simeon Hyde, jr., to take the testimony which is in the brief.   The Circuit judge makes so clear a statement of the facts,

.we will not undertake to restate them, except so far as to make the opinion intelligible.

Near the point where the waters of the Coosaw River mingle with those of St. Helena Sound, they divide, and while one portion goes direct, the other branches off towards the south, and known at first as Parrott's Creek, lower down assumes the name of Morgan River and flows into the Sound. The small body of land thus isolated is set down in chart No. 435 of the United States coast survey as "Morgan's Island." It is very low and flat as indicated by the fact that its superficial area consists of about three hundred and fifty acres of highland and about five thousand of salt marsh, for the most part subject to the ebb and flow of the tides, the mean rise and fall being from six to eight feet, and at full spring tides all the surface is under water, except the highlands and the spots called hammocks. What is known as the highlands are made up by a number of islets interspersed through the marsh; but by far the greater part is at one place on the south shore bounding on Morgan River, and contains about two hundred and fifty acres. This is the only part of the whole island capable of cultivation, and, as conceded, was once the private property of William Fripp, who had a settlement there.

On June 4, 1787, a grant was issued by the state to William Fripp of "a plantation or tract of land, containing one hundred and twenty acres of salt marsh and eight small islands situate in the district of Beaufort, in St. Helena parish, bounding south on St. Helena River, commonly called Morgan River, west on Parrott Creek, north on vacant marsh, eastward on marshes from William Fripp's land, commonly called Morgan Island, showing such shape, form, and marks as are represented by a plat herein to be annexed," &c. On July 2, 1787, a few days after the above grant, another was issued by the state to William Fripp, conveying to him "a plantation or tract of land containing thirty acres (being nine small islands), situate in the district of Beaufort, in St. Helena parish; three of the islands bound westwardly on Safe Harbor Creek, the other six on all sides by marsh lands, having such shape, form, and marks as are represented by a plat hereunto annexed," &c. There was no evidence that any other part of the marsh lands of the island had ever been granted, or

any thing tending to show that down to 1863 any person other than William Fripp, and those who held under him, ever had or claimed to have private property in any part of the said marshes.

On March 10, 1863, during the late war, under and by virtue of an act of Congress "for the collection of direct taxes in insurrectionary districts within the United States," &c., the commissioners appointed by the general government for that purpose sold and conveyed to one Edward S. Philbrick for the consideration of $255 a tract of land, which in the certificate of the tax sale is described as follows: "the tract of land known as 'Morgan Island,' bounded northerly by Coosaw River, southerly by Morgan River, easterly by St. Helena Sound, and westerly by Parrott Creek, containing two hundred and fifty-five acres, more or less," &c.   On January 27, 1865, Edward S. Philbrick sold the land (giving a quit-claim deed) to George Wells for $1,200, who executed a mortgage of the same, in which the land was still described as containing two hundred and fifty acres.   The plantation was sold to foreclose the mortgage and purchased for $3,100 by one Lewis A. Phillips, who, on February 4, 1871, sold it without warranty to C. Eiswold for $6,000.   For the first time this deed describes the plantation known as Morgan Island as containing eight hundred acres.   Eiswold again conveyed it, on December 20, 1871, to William B. Davis, and in this deed the plantation is described as containing "four hundred acres, more or less."

On October 4, 1877, W. B. Davis & Son opened a correspondence with the secretary of state (Hon. R. M. Sims), for a grant of the marsh lands on Morgan Island (4,932 acres), assigning as a reason for desiring the grant, that "parties were trespassing on the marshes, and endangering their stock, and they wished to be entirely certain as owners, before they proceeded to extreme measures."   This correspondence terminated July 16, 1879, by the secretary refusing to issue the grant, under the act of 1878, forbidding "the sale or grant of such lands, covered with water and marshes, as may be situated in that portion of the state, in which are phosphate rocks and phosphatic deposits."   16 *Stat.*, 811.

On August 29, 1879, William B. Davis sold and conveyed to

32

Charles C. Pinckney, jr., all his interest in a tract of land, described in the deed as follows: "All that tract of land situate in the County of Beaufort and state aforesaid, being the north-western portion of the island commonly known as 'Morgan Island'; bounded on the north by Coosaw River, on the east and south by a line beginning on Parrott Creek, forty-five chains to the southward of the mouth of 'Bass Creek,' and running north by forty-five degrees east (N. 45° E.) to Coosaw River or St. Helena Sound, and on the west by Parrott Creek, as indicated on the 'Map of the United States Coast Survey' of 'the entrance to Bull and Combahee Rivers,' No. 435, A. D. 1871, attached to and made a part of this deed, and containing two thousand acres more or less." This is the part of marsh lands adjacent to the Morgan Island plantation, upon which the state charges intrusion by C. C. Pinckney, jr., and the portion on the island not thus conveyed, is that upon which the state charges intrusion by the other defendant, William B. Davis, who claims to be the owner of the whole remainder of the island.

The cause came on for a hearing before Judge Wallace, who held that the state has title to all the ungranted lands within her borders, and that the presumption of her title is a rule of evidence that applies whenever title and jurisdiction are asserted by the pleadings for the state, and when a grant from the state, either actual or presumed, is set up by an individual, and in either case is sufficient to put the defendant to his defence. He held further, as matter of fact, that, up to 1863, all the marsh lands on Morgan's Island were vacant, never having been granted (except the two small portions which had been granted to Fripp in 1787), and that neither the tax title nor the statute of limitations divested the title of the state in that which was then vacant, and therefore he pronounced judgment for the state plaintiff in both cases for the marsh lands claimed, and damages for the phosphatic deposits taken from the respective parcels; excepting the one hundred and twenty acres granted to Fripp, June 4, 1787, and the little tract containing thirty acres (being nine small islands) granted to Fripp on July 2, 1787. The title to these parcels having passed out of the state, she can, as to them, neither claim the land itself, nor damage for the phosphates taken

from the parcels respectively. When they are located, it will appear upon whose part they will fall, and whether any phosphates have been taken from them. Both parties appealed.

Plaintiffs appeal "*First.* Because his honor erred in holding that the trespass of the defendant (in the Pinckney case) was under an honest but mistaken belief of right, instead of being wilful. *Second.* Because his honor erred in holding that it was impossible to tell what amount of rock has been mined on land of the state, and how much on the one hundred and twenty acres of defendant; whereas the testimony clearly shows that none was taken from defendant's territory. *Third.* Because his honor erred in striking out the testimony reported at folios 359, 348 to 354, &c."

Defendant's exceptions. Each defendant appeals, but their exceptions are so nearly identical that we will set out only those of the defendant Pinckney.

I. "Because his honor erred in admitting in evidence the entries of surveys and sales from the original books of A. D. Smith, W. E. Wording, and William H. Brisbane of their surveys and sales, made as United States tax commissioners, during the years 1863 and 1864, under and by virtue of an act of Congress, entitled 'an act for the collection of direct taxes in the insurrectionary districts within the United States, and for other purposes,' &c.

II. "Because his honor erred in holding that because the state has title to all ungranted lands within her territorial limits, she is the presumptive owner of the lands described by the pleadings herein.

III. "Because his honor erred in holding that when the state, as plaintiff, brings an action to recover land on the strength of her title, the defendant, to defeat a recovery, must produce a grant, or prove such possession as raises a presumption of a grant.

IV. "Because his honor erred in holding that the presumption of the state's title is a rule of evidence that applies whenever, by the pleadings, title and jurisdiction are asserted by the state; and that, to defeat a recovery, the defendant must rebut such presumption, either by the production of a grant, or by proving such possession as raises the presumption of a grant.

V. "Because his honor erred in holding that the assertion of title in the state by the pleadings established a *prima facie* case for plaintiff and put the defendant upon his defence, there being no allegation either that the land was vacant and ungranted when the state succeeded to the territorial rights of the British crown, or that the state has subsequently acquired title by gift, purchase, escheat, or otherwise, defendant in his answer having denied that the land is the property of the state, and set up title under a United States tax sale certificate.

VI. "Because his honor, having found as a question of fact that defendant traces title and claims under a United States tax sale certificate to Edward S. Philbrick of date 1863, should have held that this was *prima facie* evidence that the land in question is not the property of the state, and that the burden was then on plaintiff to rebut this evidence by showing that at the date of the sale to Philbrick the land within the descriptive boundaries of the certificate was the property of the state.

VII. "Because his honor should have held that by putting in evidence this certificate the burden of proof was shifted to the plaintiff to show that the land described in the pleadings was the property of the state at the date of the tax sale in 1863, and therefore not subject to taxation.

VIII. "Because his honor should have held that said certificate is *prima facie* evidence that all the land within the descriptive boundaries mentioned therein was subject to taxation at the date of the execution and delivery of the certificate; and he erred in holding otherwise.

IX. "Because, it not being alleged by the pleadings and there being no evidence whatsoever tending to show that the land in controversy was vacant and ungranted when the state succeeded to the territorial rights of the crown, nor that the state has since acquired title thereto by gift, purchase, escheat, or otherwise, his honor should have held that plaintiff is not entitled to recover the same in this action.

X. "Because the grant to William Fripp June 4, 1787, by calling for St. Helena or Morgan River and Parrott Creek as boundaries, included all the land down to low-water mark of said boundaries; and his honor erred in holding that said grant, by

calling for said boundaries, excluded from the grant the ground covered by said streams at ordinary high tide.

XI. "Because the tax sale certificate to Edward S. Philbrick conveyed whatever land is contained within the natural boundaries mentioned therein; and his honor erred in holding that 'the marsh land between low-water and ordinary high-water was not conveyed by the certificate.'

XII. "Because there is no evidence whatsoever tending to show that the state's right or title to the land in question accrued within twenty years before the commencement of this action, or that the state has received the rents and profits thereof within the space of twenty years, and his honor should have so held.

XIII. "Because his honor erred in holding that the statute of limitations of 1870, as amended by the act of 1873, is not applicable to this case; and that the state's right of action against the defendant is not barred thereby.

XIV. "Because, having found that the testimony fails to establish either what portion of the land in controversy is the property of the state or the physical boundaries thereof, the judgment should have been for the defendant.

XV. "Because, upon the pleadings and the facts found by his honor, the information should have been dismissed," &c.

We will not attempt to follow the exceptions, but endeavor, in our own order, to consider all the points made. The plaintiff's third exception, as to the exclusion of certain evidence of records, was properly withdrawn at the argument.

The defendant's first exception complains of error in admitting as evidence "the entries of surveys and sales from the original books of the commissioners of tax sales." These records are made "evidence in any court of the truth of the facts therein stated." 12 *U. S. Stat.*, § 14, p. 425. It may be that under the decision in *DeTreville* v. *Smalls*, 98 *U. S.*, 517, these records were not admissible in evidence for the purpose of impeaching the regularity and validity of the tax sale, but we can hardly doubt that they were admissible as throwing light upon the question, what did the commissioners actually sell? But the Circuit judge reports that when he came to study the case, the evidence was not considered by him in making up his judgment, and we need not therefore

consider the matter further. *Susong* v. *Vaiden*, 10 *S. C.*, 247 ; *Thompson* v. *Brannon*, 14 *Id.*, 553.

Several of the defendant's exceptions, in various forms, make the point that the Circuit judge committed error in holding that the presumption of the state's title is a rule of evidence that applies whenever by the pleadings title and jurisdiction are asserted by the state; and that to defeat a recovery the defendant must rebut such presumption either by the production of a grant or by proving such possession as raises the presumption of a grant. As we understand it, this objection does not go against the pleading, but the proofs in the case. When an individual sues for land, his complaint merely asserts title to the *locus in quo;* it need not set out the sources of his title, as that is matter of proof. So in these cases the information asserted the title of the state to the marshes in question.

But it is said that an individual would have to recover, if at all, upon the strength of his own title, of which he must make proof. That is true, and so it seems to us the state was required to do in these cases. It is said, however, that the state was not required to produce a paper title, but was allowed, contrary to the general rule, to recover upon the same presumption of a title. We do not see how the state could produce any paper title as to lands which, as alleged, had never been granted, unless perhaps she had been required to produce the history of the revolution. Our doctrine is that the state succeeded at the revolution to all the rights of the British crown, one of which, as Lord Coke tells us, was "that all lands are holden mediately or immediately of the king." The state with us is the common source of title, and retains it, indefinitely it may be, until it passes from her in the only manner known to the law, by presumption either express or implied, or hereafter possibly by operation of the new statute of limitations. We do not consider this fundamental doctrine as a mere presumption of fact, which may be overthrown; but as the established unalterable theory of our government as fixed and certain as any provision in the constitution itself. It is as if the people themselves had made a grant to the state, and to facilitate its proof had lodged it in the archives of the state. This is the original grant, so to speak, which constitutes the *prima facie*

title of the state, and as the courts take judicial cognizance of it and regard it in proof, it was, as we conceive, sufficient to put the defendant upon his defence.

We have not been referred to a case in which the precise point was ruled, but the form of proceeding in all of the cases indicates that it was taken for granted. The cases rule that the state, as such, cannot maintain a direct action of ejectment, but must proceed by information filed by the attorney general, for the reason given, that the state being possessed of a theoretical ubiquity cannot be disseized. This indicates very distinctly that the state was seized, originally had the title, and that under the doctrine of *nullum tempus* it remained in the state until it was in some way transferred. *State* v. *Arledge*, 1 *Bail.*, 551, 2 *Id.*, 401; *State* v. *Stark*, 3 *Brev.*, 101; 3 *Wash. Real Prop.*, 172; 3 *Bl. Com.*, 261. In the very learned argument for the defendants, it was said that in the case of Stark, *supra*, "that the highest court in the state, in an action by the state to recover land, declared that a non-suit ought to be granted, because the evidence failed to establish that the title to the land was vested in the state." That is true, but a careful perusal of the case will show that the question arose as to lands which had been granted for the settlers in the old town and township of Saxe Gotha. In the opinion, Judge Brevard said: "It has not been pretended that the *locus in quo* is vacant or unappropriated land, or that it has lapsed to the state by escheat. The title endeavored to be established, appears to be of a mixed and mongrel character, a legal nondescript, neither a legal nor equitable title, but partaking of the character of both; and the arguments which have been urged to support it, although learned and ingenious, appear of the same cut and character, and marvellously adapted to such a claim." We adhere to what was said by this court in the late case of the *State* v. *The Pacific Guano Company*, *ante* 50: "The state is the sovereign, the source of title, and upon this *prima facie* showing she rests, at least until it is removed by a counter showing."

But it is earnestly urged that, whilst such may have been the rule of evidence under the operation of the doctrine of *nullum tempus occurrit regi*, such doctrine no longer prevails in South Carolina; that the code adopted in 1870 (*Code of* 1882, § 95)

enacted what may be considered a statute of limitations against the state as follows: "The state will not sue any person for or in respect to any real property or the issues or profits thereof, by reason of the right or title of the state to the same, unless, 1, such right or title shall have accrued within twenty years before any action or other proceeding for the same shall be commenced; or unless, 2, the state, or those from whom it claims, shall have received the rents and profits of such real property or of some part thereof, within the space of twenty years." The defendants plead this statute, and insist that it shall be interpreted (as a similar provision in the New York code has, as alleged, been construed by the courts of that state) in such manner as to require the state, in order to defeat the bar of the statute, to show affirmatively that her right or title accrued within twenty years before action brought. The Circuit judge held as matter of fact, even according to the requirements of the New York rule, that the state had shown by both positive and negative proof that the right of action had accrued within the time limited by the act, and in that we concur with him.

But we think the facts of this case do not require us to go into that matter, and we prefer to reserve our judgment as to the proper construction of the act. Statutes of limitation, affecting only the remedy, constitute no exception to the general rule, that laws operate only upon matters which arise after their passage, unless they otherwise expressly declare. *Nichols* v. *Briggs*, 18 *S. C.*, 481. This section of the code expresses no such intent, and we think it does not operate retrospectively. This action was commenced September 2, 1882, and whether we consider the time of the tax sale (1863), when those under whom the defendants claim, had their first connection with these lands; or the time when the statute was adopted (1870), or that when the proof shows possession was first taken of these marsh lands (1879), the period of twenty years had not expired when the action was brought. It surely cannot be that a requirement as to proof, originating in a statute of limitations and having exclusive reference to that, can be obligatory in a case to which the statute of limitations has no application as an act, somewhat in the nature of a declaratory law. As was said in the case of *The Pacific Guano Company*,

above cited, "Until 1870 the doctrine of *nullum tempus* prevailed in this state, and since that time twenty years have not elapsed, so that it is not necessary to consider the scope and effect of the new provision in the code as to when and under what circumstances the state will not sue."

This brings us to the main defence made by the defendants—that they have title to the marshes in question under the tax sale certificate of the United States direct tax commissioners. It is as follows:

"United States of America.
"Tax Sale Certificate, No. 28.

"This is to certify, that at a sale of lands for unpaid taxes under and by virtue of an act entitled 'an act for the collection of direct taxes in insurrectionary districts within the United States, and for other purposes,' held pursuant to notice at Beaufort, in the district of Beaufort, in the State of South Carolina, on the 10th day of March, A. D. 1863, the tract or parcel of land hereinafter described, situate in the district of Beaufort and state aforesaid, and described as follows, to wit: the tract of land known as 'Morgan Island,' bounded northerly by Coosaw River, southerly by Morgan River, easterly by St. Helena Sound, and westerly by Parrott Creek, containing two hundred and fifty-five acres, more or less, was sold and struck off to Edward S. Philbrick for the sum of two hundred and fifty-five dollars, he being the highest bidder, and that being the highest sum bidden for the same, the receipt of which said sum in full is hereby acknowledged and confessed.

"Given under our hands at Beaufort, S. C., this tenth day of March, A. D. 1863.
                (Signed)              "A. D. SMITH,
                                       "W. E. WORDING,
                                       "WM. HENRY BRISBANE,
                                              "Commissioners."

The defendants claim that this certificate is "equi-potent with a deed," and proves itself; that it must must be taken as affording evidence, not only that all the land embraced within its extended boundaries, including the marsh as well as the highlands of the whole island, was conveyed to the purchaser, but

that the commissioners had the right to sell and make good title to the same. Judge Wallace, following the decision of the Supreme Court of the United States in the case of *DeTreville* v. *Smalls* (98 *U. S.*, 522), held that the certificate was *prima facie* evidence, not only of the regularity of the sale, but also of its validity and the title of the purchaser; but he held further, that it might be shown that the marsh lands included in the boundaries were vacant lands, and not taxable at the time of the sale in 1863, and if so, they could not be sold and conveyed for taxes.

Was this error of law? In the first place, we are inclined to think that the certificate, considered as a deed and properly construed, did not convey or intend to convey the marshes, or any more than the Fripp highlands. This seems to have been the understanding of the parties themselves at the time of the sale, and long afterwards, as shown by the successive conveyances of the land, and the correspondence of W. B. Davis & Son with the secretary of state, seeking at first a grant for these marshes, and, failing in that, to purchase them. This view is strengthened also by the surrounding circumstances at the time of the sale; by the fact that it was avowedly a sale of private property for taxes; by the character of the marshes, being uninhabited, and daily swept by the tides, they were considered worthless; and by the terms of the certificate itself, which carefully read, do not purport to convey Morgan's Island as such, but "the tract of land, known as 'Morgan Island,' containing 255 acres," &c. It is true the boundaries inserted are identical with those of the whole island; but that inaccuracy, or mistake, might and probably did occur by confounding the tract of land naturally called Morgan Island, with the island itself, especially as it was very difficult to give accurate boundaries to the tract of land bearing that name, as it was the only settlement on the island, and had no neighbors with adjacent lands, but rose out of the marshes, and stood in their midst isolated, and as clearly marked, as an island itself. We are aware that natural objects named as boundaries are entitled to much weight in questions of location, but at last the true criterion in such cases is the intention of the parties. *Norwood* v. *Byrd*, 1 *Rich.*, 135. For many reasons it seems to us difficult, if not impossible, to conceive how commissioners, making sales

for taxes in arrear, could advertise for sale a tract of land "known as Morgan Island," containing 255 acres, and then not sell the tract of land, so advertised, but the whole of Morgan Island, containing nearly 6,000 acres, nineteen-twentieths of which was at the time regarded utterly worthless, and had never been occupied for agricultural purposes. But as the Circuit judge made no distinct ruling upon the point, we will pass it.

Second. But on the presumption that there was no inaccuracy or mistake in setting out the boundaries, and that the certificate intended to convey everything within its extended boundaries, how would the matter stand? It will be observed that the territory embraced is bounded on all sides by great navigable tidal streams, viz., Coosaw River, Parrott Creek, Morgan River, and St. Helena Sound; and such description, according to the well established common law rule, only carried the title of the riparian proprietor down to ordinary high-water mark, excluding all the marsh lying below that line, and subject to the daily ebb and flow of the tides. *United States v. Pacheco,* 2 *Wall.,* 587 ; 3 *Wash. Real Prop.,* *634; *State v. The Pacific Guano Company, supra.* Mr. Washburn, at the page indicated, states the common law rule thus: "If the boundary be a navigable stream, that is, one in which the tide ebbs and flows, the land extends only to the water's edge, or to high-water mark. 5 *Wend.,* 423; 3 *Scamm.,* 520 ; 7 *Conn.,* 186. And the owner of land bounding on such a stream would have no cause of action against one who, in navigating it, should lay his boat or vessel or raft upon the shore fronting his land, if he has not made improvements upon the same, since the title to the shore is in the state. So a conveyance bounding 'westerly by the beach,' excludes the shore or land between low and high water mark. The same is the rule where the land is bounded by the sea, or an arm of the sea. The space between high and low water mark of the border of the sea is called the 'shore,' and belongs by the common law to the sovereign, precluding, of course, the claim of any other person, unless acquired by grant from the sovereign. The state, in such cases, holds the fee in trust for the public," &c.

This being undoubtedly the common law rule, has it been changed in this state? As there has been some change effected,

from well-known causes, as to what shall be regarded "naviga-
bility," we have looked in vain for some authoritative decision
changing the law in relation to riparian rights on tidal navigable
streams. We find no such case, but, on the contrary, that as
late as 1850 it was declared by the late Law Court of Appeals,
in *McCullough* v. *Wall* (4 *Rich.*, 80), "that no authoritative
decision has yet been made in this state which has changed the
common law on the subject;" and that this exact expression was
repeated two years after (1852) in *Shands* v. *Triplet* (5 *Rich.
Eq.*, 79), in the late Equity Court of Appeals, composed of such
judges as Chancellors Johnstone, Dunkin, Dargan, and Wardlaw.
By his great industry, the counsel for the defendants found and
cited the case of *Trapier* v. *Wilson* (2 *McCord*, 191), which he
urged had changed the rule. That was a contest between John
T. Wilson and Paul Trapier as to whether there was any vacant
land on "North Island"—meaning vacant highlands. The case
itself states that "the question was whether the grant to Laroche
(under which Mr. Trapier claimed) covered the whole of the
island except the salt water marsh, or was it to be located accord-
ing to the courses and distances set forth in the plat?" It was a
simple question of location, the only point being whether the grant
covered the upland of the whole island. It was held that the
whole island was covered by the grant, and from this it is sought
to draw an inference that the court held the doctrine that Tra-
pier, as riparian proprietor, had title down to low-water mark.
We cannot perceive that any such decision was involved in the
case. The doctrine we are considering was not broached, and
neither the common law rule nor the words "high" or "low-
water" mark were referred to in the opinion. Judge Richard-
son, in delivering the judgment, again excepts the marshes. He
says: "By the description set forth in the grant, the location is
plain and unquestionable. The whole island (unless the marsh
be so called) is clearly within it." It seems that in those days,
before the discovery of phosphates, salt marsh went for nothing.

It is strongly urged upon us that the line of high water, as a
limit to the rights of riparian proprietors on navigable tidal
streams, will be uncertain, inconvenient, and difficult of enforce-
ment; that it will be against the settled usage of our people and

an injustice to such of them as live upon the seaboard.  We have heard nothing of the·"usage" spoken of through the medium of sworn testimony in the case.  If the enforcement of the rule (it is no new law or principle) should produce inconvenience, we would most sincerely regret it.  But finding it incumbent upon us to decide the question, seeing clearly the rule of the common law, and failing to find any authoritative decision which changes that rule, we must hold that it is now, as it always has been, the law of the state.

Third.  By the laws both of the United States and of this state ungranted vacant land is not taxable, and therefore cannot be sold for taxes.  It is contended, however, upon this point, that proof tending to show that the marshes were vacant ungranted land at the time of the sale was inadmissible, for the reason that these marshes were included within the boundaries of the tax certificate, which must be taken as affording evidence of the fact "that all the land within the descriptive boundaries mentioned therein was subject to taxation at the date of the execution and delivery of the certificate."  We cannot accept this view.  The certificate may be conclusive evidence as to some particulars—as, for instance, the regularity and validity of the sale—but it would be against all principle to allow it to give character to lands by simply including them within its boundaries.  As was said in the case of *Cooke* v. *Pennington* (15 *S. C.*, 194): "It would be a reproach to the administration of justice if a deed executed under these circumstances should be held to prove itself conclusively and to transfer one man's property to another."

But even if such a *prima facies* existed, it was surely admissible to rebut it by proof.  The act of Congress under which the sale took place has been construed to allow the certificate to be annulled by establishing the fact that the property was not subject to taxes.  *De Treville* v. *Smalls, supra.*  In that case it is said that "the act of 1863 declares that the commissioners' certificate shall be *prima facie* evidence not only of the regularity of the sale, but also of its validity and of the title of the purchaser; and it enacts that it shall only be affected as evidence of the regularity and validity of the sale by establishing the fact *that the property was not subject to taxes,* or that the taxes had

been paid previously to the sale, or that the property had been redeemed," &c. Under the act, therefore, proof was allowable tending to show that "*the property was not subject to taxes.*" This could be effected, as was done, by showing that at the time of the sale the marsh lands were vacant lands. The Circuit judge found as matter of fact that the marshes were vacant land at the time of the sale, and we cannot therefore say that he committed error when he held that "as the title to the marshes had never been conveyed by the state (except the one hundred and twenty acres granted to Fripp), the state is now entitled to recover the same."

One of the grounds of appeal complains that the judgment was too uncertain to be enforced and therefore should be set aside. It does not seem to us that there is such uncertainty about it. The judge settled the rights of the parties by declaring that the state, plaintiff, was entitled to recover all the marsh lands except what was included in the grant to Fripp. Of course, that will have to be located, but does not make the judgment uncertain.

The plaintiff complains that the judge committed error in holding that the trespass of the defendants was under an honest but mistaken belief of right instead of being wilful. We are not sure that we have the right, but if we have, we decline to disturb the finding of the judge in the particular indicated.

The judgment of this court is that the judgment of the Circuit Court, in the case of The State *v.* C. C. Pinckney, Jr., and also in the case of The State *v.* William B. Davis, be affirmed.

In these cases there was a petition for a rehearing, upon which the following order was passed:

PER CURIAM. We have carefully considered this petition for a rehearing of the above stated cases. As we understand it, the application is based on two grounds.

First, for the reason as supposed that the court made a mistake in holding that "all the marshes in question are below high-water mark, while the testimony is that a large portion of the marshes are not covered by the ordinary or daily tides." This court did not undertake to decide how much of the marshes lie below high-water mark, but simply to announce the common law

rule as to the rights of riparian proprietors bounding on tidal navigable streams, and to hold that so much of the marshes as lie below that line (whatever it may be) could not pass by the certificate of tax sale which called for tidal navigable streams as boundaries; or, as stated in the decree, "excluding all the marsh lying below that line and subject to the daily ebb and flow of the tide," &c.

Second. That it was a mistake in the court to assume that the Circuit judge (Wallace) found, as a matter of fact, that the marshes were "vacant" at the time of the tax sale in 1863. There was no mistake. As we understand, Judge Wallace did hold that the marshes (with the exception of the portion covered by the grants to Fripp) were "vacant" even down to 1877, and in 1879. In the case of The State *v.* C. C. Pinckney, Jr., he said: "Windsor, Pengelly, and Freland, all testify that the salt marshes were vacant in 1877. White testifies that Davis, defendant's grantor, refused to pay for rock dug in the marshes in 1879." A finding that the marshes were "vacant" in 1877 or 1879 involved necessarily a finding that they were vacant up to that time, including of course 1863. If vacant in 1877, they must have been vacant in 1863. Land is never again vacant after the title has once passed out of the state. In the case of William B. Davis, Judge Wallace says expressly: "The tax sale certificate does not convey this marsh for the reasons stated in the decree in the case of The State *v.* Pinckney, Jr., above referred to. It is also in proof that the marshes have not been occupied or held adversely, and were therefore 'vacant' prior to 1863. It is therefore adjudged that the State of South Carolina is the owner and is entitled to recover all the marsh land described in paragraph 47 of the information," &c.

The petition is refused. [1]

---

[1] These cases have been taken under writ of error to the Supreme Court of the United States.—REPORTER.